(No. 15202.—Judgment affirmed.)

THE CITY OF CHICAGO, Appellant, *vs.* THE TRIBUNE COMPANY, Appellee.

*Opinion filed April 18, 1923.*

1. LIBEL—*prosecution for libel on government is unknown to American courts.* A prosecution, civil or criminal, for libel on the government has no place in the American system of jurisprudence, as the people have a right to discuss their government without fear of being called to account in the courts for their expressions of opinion.

2. CONSTITUTIONAL LAW—*when utterances against the government are privileged.* Where any person by speech or writing seeks to persuade others to violate existing law or to overthrow by force or other unlawful means the existing government he may be punished, but all other utterances or publications against the government must be considered absolutely privileged against civil as well as criminal prosecutions.

3. SAME—*reason for the privilege of free speech.* The privilege of free speech is founded on the principle that it is advantageous for the public interest that the citizen shall not be in any way fettered in expressing his opinions and shall have the right to speak his mind freely where the public service or due administration of justice is involved.

4. MUNICIPAL CORPORATIONS—*city cannot maintain prosecution for libel.* As cities exist primarily for governmental purposes and are permitted to enter the commercial field solely for the purpose of subserving the interests of the public which they represent, the fact that a city owns and operates certain public utilities in its capacity of a private corporation does not entitle it to maintain an action for libel against an individual or a corporation publishing a newspaper on the ground that the libelous utterances tend to impair the financial credit of the city.

APPEAL from the Circuit Court of Cook county; the Hon. HARRY M. FISHER, Judge, presiding.

SAMUEL A. ETTELSON, Corporation Counsel, (CHESTER E. CLEVELAND, OTTO W. ULRICH, and EDWARD C. HIGGINS, of counsel,) for appellant.

McCORMICK, KIRKLAND, PATTERSON & FLEMING, (WEYMOUTH KIRKLAND, HOWARD ELLIS, and ROBERT R. McCORMICK, of counsel,) for appellee.

Mr. CHIEF JUSTICE THOMPSON delivered the opinion of the court:

The city of Chicago, a municipal corporation, brought in the circuit court of Cook county its action of trespass on the case for libel against the Tribune Company, a corporation publishing a newspaper circulating in the city of Chicago and surrounding territory, alleging damages of $10,000,000. The declaration consists of twelve counts. It avers that the city has a population of about 3,000,000 people; that it owns property, consisting of public buildings, public parks, public streets and bridges, public hospitals, a waterworks system, police and fire equipment, and other property, of the value of $350,000,000; that exclusive of amounts required for school purposes it spends each year for materials, labor and supplies about $50,000,000; that it purchases each year new property valued at approximately $7,000,000; that it is obliged to purchase most of this property, materials and supplies through competitive bidding; that it is necessary, in order to advantageously purchase such property, materials and supplies, to have good credit; that the city must from time to time issue bonds for public purposes and that the market value of these bonds depends upon the financial standing of the city; that the Tribune Company in its newspaper maliciously published concerning the city false, scandalous and defamatory matter; that in various articles appearing from time to time in 1920 it charged that the city was "broke;" that it "owes millions of 1921 funds;" that "bankruptcy is just around the corner from the city of Chicago;" that its "credit is shot to pieces;" that "the city is headed for bankruptcy unless it makes immediate retrenchments;" that "the city's

financial affairs are in a serious way;" that "it is the issue between this Tammany government, which has bankrupted the treasury of the city of Chicago, which is in default to the city creditors;" that the city administration "having busted the city and having reduced it to such insolvency that it is issuing Villa script to pay its bills, is reaching out for the State;" that the administration "is paying city debts with city hall script, and we have just begun to feel the effects of being busted;" that "Chicago is drifting into a receivership;" that "the city is hurrying on to bankruptcy and is threatened with a receivership for its revenue;" that the city "is bankrupt and the banks of the city have refused it credit;" that "the city government has run on the rocks;" that "the city cannot pay its debts,—it is bankrupt, the bankers have refused it credit," and divers other similar false and defamatory statements; that while the city was deprived of $7,000,000 theretofore derived from saloon licenses, and that while it was obliged to meet the current high cost of labor, supplies, materials and property, in consequence of which the corporate fund was depleted and there was not enough actual cash to meet the current obligations of the city, there was at all times abundant cash in each of the other funds, to-wit, special assessment fund, waterworks fund, bond fund, traction fund and other special funds, but the false publications made by the Tribune Company were general in their nature and applied indiscriminately to these several funds, thereby injuriously affecting the credit and financial standing of the city; that each and all of said publications were false and were published maliciously and in reckless disregard of the rights of the city; that none of said statements were published with good motives or for justifiable ends; that said statements were published to promote the political and financial interests of the Tribune Company, its political friends and the public utility corporations associated and acting in co-operation with it; that said statements were published with the

intent and purpose to impair the credit and financial standing of the city and to give the impression to its readers and to the public that the management of the administrative and governmental affairs of the city was incompetent and corrupt, that the city was unworthy of credit and could not pay its obligations, and that it would be dangerous for persons or firms to invest in bonds issued by the city and to enter into contracts with the city for the sale of property, materials and supplies; that by reason of said publications many persons and firms that would otherwise have been ready, able and willing to sell and furnish property, material and supplies to the city neglected to file their bids, by reason whereof competition was stifled and the city was compelled to pay, and did pay, higher prices than it otherwise would have been obliged to pay, by reason of which it lost $5,000,-000; that by reason of said publications certain persons who would otherwise have bid for the city's bonds refused to bid for them, in consequence of which the bonds sold for less amount than would otherwise have been realized, whereby the city lost $2,500,000; and that by reason of said publications, and in consequence of the resulting injury to the city's credit and financial standing, it was unable to conduct its business on an economical basis, thereby suffering a further loss of $2,500,000. A demurrer filed to this declaration was sustained, and this appeal followed.

The articles were published in the summer of 1920 during the progress of the campaign between rival candidates for the republican nomination for Governor of the State. One of the two leading candidates was supported by the Tribune Company and the other by the administration of the city of Chicago. Many of the publications are quotations from speeches of the candidate supported by the newspaper and of his political friends. The Tribune Company claims it was within its rights guaranteed by section 4 of article 2 of the constitution, which declares: "Every person may

freely speak, write and publish on all subjects, being responsible for the abuse of that liberty;" and further, that it is a fundamental principle of the American system of government that any person may criticise the government with impunity so long as he does not advocate the violation of existing law or the overthrow of the existing government by unlawful means. The city contends that the constitutional privilege extends only to the publication of "the truth when published with good motives and for justifiable ends," and that a city, as any other corporation, may be libeled with respect to its private enterprises. Many procedural questions have been argued, but we shall consider only the substantive question, Can a city maintain an action for libel?

The struggle for freedom of speech has marched hand in hand in the advance of civilization with the struggle for other great human liberties. History teaches that human liberty cannot be secured unless there is freedom to express grievances. As civilization advanced and as the means for expressing grievances multiplied, the struggle between the people and their despotic rulers became more bitter. With the opening of the seventeenth century the people began to publish newspapers, and history begins to record unspeakable prosecutions of the editors. For one hundred years the crown forbade the publication of a newspaper without a license. As the seventeenth century drew to a close the right to publish without a license was recognized, and from that time to this no English government has claimed or practiced the royal prerogative of licensing the press. Licensing of the press was never effective in the American colonies. The last attempt to enforce this common law right of the crown in the American colonies failed in 1725, and so for more than fifty years prior to the adoption of the Federal constitution, and for nearly one hundred years prior to the adoption of our first State constitution, licensing of the press was completely abolished in America. While this right of the crown went out with the seventeenth cen-

tury, freedom of speech had not yet been established and the restriction of this fundamental right then took the form of subsequent punishments. Political prosecutions by the government were vigorously used to silence opposition. Truth was no defense, because the despotic governments declared that "the greater the truth the greater the libel." The names of martyrs to the cause of freedom of speech became household words in England and in America. To obtain freedom from this oppression of the crown was one of the many reasons why the American colonists revolted.

It is interesting to follow the viewpoint of the writers of different periods in their discussion of the right of the citizen to criticise his government. Holt, an early English author, says in his Law of Libel, (1st Am. ed. p. 92) : "If it be the highest crime known to our laws to attempt to subvert by force the constitution and State, it is certainly a crime, though of inferior magnitude yet of great enormity, to endeavor to despoil it of its best support,—the veneration, esteem and affection of the people. It is therefore a maxim of the law of England, flowing by natural consequence and easy deduction from the great principle of self-defense, to consider as libels and misdemeanors every species of attack, by speaking or writing, the object of which is wantonly to defame or indecorously to calumniate that economy, order and constitution of things which make up the general system of the law and government of the country. Opinion is strength, and the good fame of government is necessary to maintain this opinion. The distance is not very great between contempt of the laws and open resistance to them." And again, on page 102 he says: "Our courts of justice considered all abuse and invective against the king and his court officers, all slander which interfered with the government of the nation, and all libels which reflected upon the conduct and management of State affairs, as little short of treason and concerted designs for the subversion of the government itself. It is no wonder, there-

fore, if in those times [prior to James I] we should find such words and writings charged as acts of treason which in our age of improved learning and mildness in the administration of the law pass only for libels,—the overflowings of seditious gall and the resentments of disorderly and petulant spirits." Note the change when Stephen, in his History of Criminal Law of England, written in 1883, says: "In one word, nothing short of direct incitement to disorder and violence is a seditious libel. * * * It is enough to say that in this country and in this generation the time for prosecuting political libels has passed and does not seem likely to return within any definable period." (2 Stephen, pp. 375, 376.) Odgers, another English writer, says: "The test whether the statement is a seditious libel is not either the truth of the language or the innocence of the motive with which the statement is published, but is this: Is the language used calculated to promote public disorder or physical force or violence, or violence in a matter of State?" (Odgers on Libel and Slander,—5th ed.— p. 513.)

There were few prosecutions for libel on government in the American colonies, and no court of last resort in this country has ever held, or even suggested, that prosecutions for libel on government have any place in the American system of jurisprudence. The right of the government to prosecute its accusers was founded on the theory that the king could do no wrong. He was an hereditary monarch and was not responsible to the people. When the people became sovereign, as they did when our government was established under our constitution and the ministers became servants of the people, the right to discuss government followed as a natural sequence. When the sovereign power is vested in an hereditary monarch there is no occasion for discussing the government and exposing its inefficiency or corruption unless to advocate reformation by violence, because there can be no remedy except by revolution. It ap-

pears, therefore, that there was reasonable foundation for prosecuting the government's critics in the days of "divine rights" of kings, but since the people are sovereign and since the magistrates are servants of the people the magistrates can do wrong, and the people have a fundamental right to criticise them and to expose their inefficiency and corruption so that they may be displaced. It is one of the fundamental principles, therefore, of the American system of government, that the people have the right to discuss their government without fear of being called to account in the courts for their expressions of opinion. Cooley says: "The English common law rule which made libels on the constitution or the government indictable, as it was administered by the courts, seems to us unsuited to the conditions and circumstances of the people of America and therefore to have never been adopted in the several States. If we are correct in this, it would not be in the power of the State legislatures to pass laws which should make mere criticisms of the constitution or of the measures of government a crime, however sharp, unreasonable and intemperate it might be." (Cooley's Const. Lim.—7th ed.—614.) Stephen says: "There may, indeed, be breaches of the peace which may destroy or endanger life, limb or property, and there may be incitements to such offenses, but no imaginable censure of the government short of a censure which has an immediate tendency to produce such a breach of the peace ought to be regarded as criminal. * * * The change of public sentiment as to the free discussion of political affairs has practically rendered the law as to political libels unimportant, inasmuch as it has practically restricted prosecutions for libel to cases in which a libel amounts either to a direct incitement to crime or to false imputations upon an individual of disgraceful conduct in relation to either public or private affairs." (2 Stephen's History of Criminal Law, pp. 300, 301.) In the second volume of his Constitutional History of England (7th ed. p. 379,) May says:

"Prosecutions for libel, like the censorship, have fallen out of our constitutional system. When the press errs it is by the press itself that its errors are corrected. Repression has ceased to be the policy of rulers, and statesmen have at length fully realized the wise maxim of Lord Bacon that 'the punishing of wits enhances their authority, and a forbidden writing is thought to be a certain spark of truth, that flies up in the faces of them that seek to tread it out.' "

Only once in the history of the United States has there ever been an attempt to transplant the English rule of libels on government to American soil. In 1798 Congress passed the infamous Sedition law, which punished false, scandalous and malicious writings against the government, either house of Congress or the President, if published with intent to defame any of them or to excite against them the contempt or hatred of the people. In so far as this law punished defamation of the President or any other person and in so far as it punished those who advocated resistance to law or rendered aid to a foreign foe, it was, of course, constitutional, but in so far as it sought to make criminal any defamation of the government or of the administration in power it has been generally considered to be unconstitutional. In discussing this act James Madison said: "Some degree of abuse is inseparable from the proper use of everything, and in no instance is this more true than in that of the press. It has accordingly been decided by the practice of the States that it is better to leave a few of its noxious branches to their luxuriant growth, than by pruning them away to injure the vigor of those yielding the proper fruits. And can the wisdom of this policy be doubted by anyone who reflects that to the press, alone, checkered, as it is, with abuses, the world is indebted for all the triumphs which have been gained by reason and humanity over error and oppression; who reflects that to the same beneficent source the United States owe much of the lights which conducted them to the rank of a free and independent nation and

which have improved their political system into a shape so auspicious to their happiness? Had sedition acts forbidding every publication that might bring the constituted agents into contempt or disrepute, or that might excite the hatred of the people against the authors of unjust or pernicious measures, been uniformly enforced against the press, might not the United States have been languishing at this day under the infirmities of a sickly confederation? Might they not, possibly, be miserable colonies, groaning under a foreign yoke?" (4 Elliot's Debates on the Federal Constitution, 571.) Cooley says: "The Sedition law was passed during the administration of the elder Adams, when the fabric of government was still new and untried and when many men seemed to think that the breath of heated party discussions might tumble it about their heads. Its constitutionality was always disputed by a large party and its impolicy was beyond question. It had a direct tendency to produce the very state of things which it sought to repress. The prosecutions under it were instrumental, among other things, in the final overthrow and destruction of the party by which it was adopted, and it is impossible to conceive at the present time of any such state of things as would be likely to bring about its re-enactment or the passage of any similar repressive statute. * * * If any such principle of repression should ever be recognized in the common law of America, it might reasonably be anticipated that in times of high party excitement it would lead to prosecutions by the party in power to bolster up wrongs and sustain abuses and oppressions by crushing adverse criticism and discussion. The evil, indeed, could not be of long continuance, for, judging from experience, the reaction would be speedy, thorough and effectual; but it would be no less a serious evil while it lasted, the direct tendency of which would be to excite discontent and to breed a rebellious spirit. Repression of full and free discussion is dangerous in any

government resting upon the will of the people." Cooley's Const. Lim.—7th ed.—pp. 613, 614.

There were a number of prosecutions under the Sedition act and many recalcitrant spirits were thrown into jail for expression of opinions contrary to those entertained by the administration in power. When Jefferson became President he remitted, with interest, the fines that had been levied against persons convicted under the act and pardoned all those who were sentenced to imprisonment. In answer to the criticism of his acts he replied: "I discharged every person under punishment or prosecution under the Sedition law because I considered, and now consider, that law to be a nullity as absolute and palpable as if Congress had ordered us to fall down and worship a golden image." The proponents of the Sedition act argued that true liberty of the press permitted only the truth to be published with good motives and for justifiable ends. To this Madison replied: "In the first place, where simple and naked facts, alone, are in question, there is sufficient difficulty in some cases, and sufficient trouble and vexation in all, in meeting a prosecution from the government with the full and formal proof necessary in a court of law. But in the next place, it must be obvious to the plainest minds that opinions and inferences and conjectural observations are not only in many cases inseparable from the facts, but may often be more the objects of the prosecution than the facts themselves; or may even be altogether abstracted from particular facts; and that opinion and inferences and conjectural observations cannot be subjects of that kind of proof which appertains to facts before a court of law. Again, it is no less obvious that the intent to defame or bring into contempt or disrepute or hatred, which is made a condition of the offense created by the act, cannot prevent its pernicious influence on the freedom of the press. For, omitting the inquiry how far the malice or the intent is an inference of the law from the mere publication, it is manifestly impossible to punish

the intent to bring those who administer the government into disrepute or contempt without striking at the right of freely discussing public characters and measures, because those who engage in such discussions must expect and intend to excite these unfavorable sentiments so far as they may be thought to be deserved. To prohibit the intent to excite those unfavorable sentiments against those who administer the government is equivalent to a prohibition of the actual excitement of them; and to prohibit the actual excitement of them is equivalent to a prohibition of discussions having that tendency and effect; which, again, is equivalent to a protection of those who administer the government, if they should at any time deserve the contempt or hatred of the people, against being exposed to it, by free animadversions on their characters and conduct. Nor can there be a doubt, if those in public trust be shielded by penal laws from such strictures of the press as may expose them to contempt or disrepute or hatred where they may deserve it, that in exact proportion as they may deserve to be exposed will be the certainty and criminality of the intent to expose them and the vigilance of prosecuting and punishing it; nor a doubt that a government thus intrenched in penal statutes against the just and natural effects of a culpable administration will easily evade the responsibility which is essential to a faithful discharge of its duty." 4 Elliot's Debates on the Federal Constitution, 575.

The fundamental right of freedom of speech is involved in this litigation and not merely the right of liberty of the press. If this action can be maintained against a newspaper it can be maintained against every private citizen who ventures to criticise the ministers who are temporarily conducting the affairs of his government. Where any person by speech or writing seeks to persuade others to violate existing law or to overthrow by force or other unlawful means the existing government he may be punished, (*People* v. *Lloyd,* 304 Ill. 23; *Gilbert* v. *Minnesota,* 254 U. S.

325, 41 Sup. Ct. 125;) but all other utterances or publications against the government must be considered absolutely privileged.

While in the early history of the struggle for freedom of speech the restrictions were enforced by criminal prosecutions, it is clear that a civil action is as great, if not a greater, restriction than a criminal prosecution. If the right to criticise the government is a privilege which, with the exceptions above enumerated, cannot be restricted, then all civil as well as criminal actions are forbidden. A despotic or corrupt government can more easily stifle opposition by a series of civil actions than by criminal prosecutions, because (a) a civil action can be started without the filing of a complaint with leave of court and without the necessity of a grand jury investigation; (b) in a civil action the judge instructs the jury and the jury must follow his instructions on the law, while in a criminal prosecution the jury are the judges of the law as well as of the facts; (c) in civil actions the judge may grant new trials until the defendant is exhausted by expense or until a jury is found that will give judgment against him; (d) our statute limits the punishment in criminal cases to a $500 fine or jail imprisonment of one year, whereas in civil actions there is no limit to the amount of damages that may be sought; (e) in a civil action the government can recover by proving its case by a mere preponderance of the evidence, while in a criminal action it must prove its case beyond a reasonable doubt; (f) the defendant in a criminal action is presumed to be innocent until he is proven guilty, and no such presumption exists in a civil action; and (g) the government is required in a criminal prosecution to furnish to the defendant the names of the witnesses by whom it expects to sustain its charges, but in a civil action it may keep its proof a secret until it is revealed from the witness stand. It follows, therefore, that every citizen has a right to criticise an inefficient or corrupt government without fear of civil as well

as criminal prosecution. This absolute privilege is founded on the principle that it is advantageous for the public interest that the citizen should not be in any way fettered in his statements, and where the public service or due administration of justice is involved he shall have the right to speak his mind freely.

The government consists of associated persons representing the sovereign, who make, interpret and enforce the laws. The American system of government is founded upon the fundamental principle that the citizen is the fountain of all authority. Under our system this sovereign citizen has conferred certain authority upon his servants,— officers of the law commissioned for a fixed time to discharge specific duties. In order to serve their needs the citizens of Illinois, acting through the State government erected by them, have authorized the organization of city governments. The persons living within the corporate limits of these cities select officers who constitute the city government. The activities of these governments are limited by the needs of the people. All organized governments own and operate more or less property, and certain proprietary rights have long been recognized as necessary for the welfare of the inhabitants of the municipality. Municipal corporations, however, exist primarily for governmental purposes, and they are permitted to enter the commercial field solely for the purpose of subserving the interests of the public which they represent. A city is no less a government because it owns and operates its own water system, its own gas and electric system and its own transportation system. In *Byrne* v. *Chicago General Railway Co.* 169 Ill. 75, this court said: "The city is but an agency of the State, and governs, within its sphere, for the State. * * * The government exercised by the city is exercised as an agency of the whole public and for all the people of the State. A municipal corporation, like a State or county, is within its prescribed sphere a political power." In *City of*

*Chicago* v. *M. & M. Hotel Co.* 248 Ill. 264, we said: "The city of Chicago is organized under the statute known as the City and Village act. It may exercise only such powers as are expressly delegated to it by the legislature and such as are necessarily implied from those expressly given. All governmental powers primarily reside in the people. Some of these powers have been delegated to the Federal government by the constitution of the United States. All of the powers not thus delegated are reserved to the people of the several States and are exercised by the people through their representatives in the legislature and the other departments of the State government. * * * The legislature may delegate all or a part of its power to municipalities created by the legislature. * * * Counties, * * * cities, villages and other municipal and *quasi* municipal corporations are created under the authority of the legislature to better accomplish the purposes of local government." While for certain limited purposes it is often said that a municipality owns and operates its public utilities in its capacity as a private corporation and not in the exercise of its powers of local sovereignty, yet because of its proprietary rights it does not lose its governmental character. Its property is not subject to execution, (*City of Chicago* v. *Hasley,* 25 Ill. 485,) nor to Federal taxation, (*Pollock* v. *Farmers' Loan and Trust Co.* 157 U. S. 429, 584,) nor is the city subject to garnishment, (*Merwin* v. *City of Chicago,* 45 Ill. 133,) and its so-called private property may, with exceptions, be taken from it by the State. (*Ward* v. *Field Museum,* 241 Ill. 496.) It is manifest that the more so-called private property the people permit their governments to own and operate, the more important is the right to freely criticise the administration of the government. As the amount of property owned by the city and the amount of public business to be transacted by the city increase, so does the opportunity for inefficient and corrupt government increase

and the greater will be the efforts of the administration to remain in control of such a political prize. The richer the city the greater the incentive to stifle opposition. In so far as the question before us is concerned, no distinction can be made with respect to the proprietary and governmental capacities of a city.

By its demurrer appellee admits it published malicious and false statements regarding the city of Chicago with intent to destroy its credit and financial standing, and assuming that there was a temporary damage to the city and a resultant increase in taxes, it is better that an occasional individual or newspaper that is so perverted in judgment and so misguided in his or its civic duty should go free than that all of the citizens should be put in jeopardy of imprisonment or economic subjugation if they venture to criticise an inefficient or corrupt government. We do not pass upon the truth or falsity of the publications nor the merits of the political controversy between the parties. We consider the question solely from the standpoint of public policy and fundamental principles of government. For the same reason that members of the legislature, judges of the courts and other persons engaged in certain fields of the public service or in the administration of justice are absolutely immune from actions, civil or criminal, for libel for words published in the discharge of such public duties, the individual citizen must be given a like privilege when he is acting in his sovereign capacity. This action is out of tune with the American spirit and has no place in American jurisprudence.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*