Dan SMOOT, Plaintiff,

v.

The LEAGUE OF WOMEN VOTERS OF the GRAND TRAVERSE AREA OF MICHIGAN, an association affiliated with the League of Women Voters of Michigan, a Michigan corporation, and Florabelle Grovenor, Mary Force, Margot Power and Sarah Hardy, jointly and severally, Defendants.

Dan SMOOT, Plaintiff,

v.

LEAGUE OF WOMEN VOTERS, GRAND TRAVERSE AREA OF MICHIGAN, an association affiliated with the League of Women Voters of Michigan, a Michigan corporation, Margot Power and Mary Force, jointly and severally, Defendants.

Civ. A. Nos. 4708, 4709.

United States District Court
W. D. Michigan, S. D.

Sept. 28, 1964.

Davidow & Davidow, Detroit, Mich., Larry S. Davidow, Detroit, Mich., of counsel, for plaintiff.

Warner, Norcross & Judd, Grand Rapids, Mich., Harold S. Sawyer and Lewis A. Engman, Grand Rapids, Mich., of counsel, for defendants.

FOX, District Judge.

This is a libel action brought by plaintiff, the featured commentator on a series of television programs dedicated to informing the public on topics of national concern, against defendant League, a non-profit organization, and some of its officers and members, devoted essentially to the same purposes. The subject matter of this action consists of material contained in the December 1963 Bulletin of defendant League and in a letter of the same date to the editor of the local newspaper, each of which contained allegedly libelous remarks on plaintiff's presentation and the content of his program.

At this time the Court is presented with the difficult task of setting a time for the trial of the case, in the face of burdens and obligations on the side of both parties, which must be balanced in arriving at the decision.

The action was commenced in March of 1964, claiming $500,000 damages. The Court issued an order on May 18, 1964, directing the parties to complete all preparations for a pretrial conference by August 25, 1964. On July 15, 1964, a hearing was held on objections to interrogatories, and on September 25, 1964, a hearing was held on defendants' motion for security for costs and to deny a jury trial because of failure to give notice of the demand therefor. Immediately following these matters, the pretrial was conducted, at which plaintiff's counsel notified the Court for the first time of arrangements for a vacation commencing in mid-October and terminating in late November. At the same time, he suggested to the Court that the case be tried some time after January 1, 1965.

The dominating concern for defendants in this matter is the effect which this action has on their exercise of freedom of speech. The pendency of this suit effectively stills the voice of the defendant League of Women Voters and its individual members, and this quite conceivably prevents the free interchange of ideas in the public marketplace. Not only is the Traverse City Branch of the League silenced pro tempore, but branches of the League all over the country will doubtless proceed haltingly in speaking out on political theories advanced by those of differing political persuasions, not to mention all those who are opposed to Mr. Smoot and his particular philosophy of government. The fact that this may or may not be occasioned unintentionally is of no import, for the practical result is that he and those of like mind are free to continue speaking out, while those opposed to that line of thought are not so at liberty until the question of libel here presented is settled.

The dangers inherent in this situation have long been recognized by the courts in this land. In the case of City of Chicago v. Tribune Co., 307 Ill. 595, 607, 139 N.E. 86, 90, 28 A.L.R. 1368 (1923) it was said:

"While in the early history of the struggle for freedom of speech the restrictions were enforced by criminal prosecutions, it is clear that a civil action is as great, if not a greater, restriction than a criminal prosecution."

In the recent and widely publicized case of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, attention was once more focused on the commitment of the courts to the protection of the right to freedom of expression, no matter what form the suppression assumes. It is noteworthy that at Page 269, 84 S.Ct. at 720, 11 L.Ed.2d, at 700, the Court said:

"* * * [L]ibel can claim no talismanic immunity from constitutional limitations. It must be measured by standards that satisfy the First Amendment."

And in discussing the effect of libel actions in this area the Court said at Page 278, 84 S.Ct. at page 725, 11 L.Ed. 2d, at 705:

"Whether or not a newspaper can survive a succession of such judgments, the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive." [1]

Thus, this problem must be considered "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen, * * *." New York Times Co. v. Sullivan, supra, at 270, 84 S.Ct. at 721, 11 L.Ed.2d at 701.

In the mind of this Court, the case before it presents a striking example of the importance of this freedom and calls into play the very essence of the under-

1. It is worth noting at this point that the judgment in the state court in the Times case was $500,000, the same amount requested in the complaint in this action. How much more telling is the above quote in light of the fact that here we have not a prosperous newspaper corporation, but rather an impecunious organization which could not survive *one*, never mind a "succession of such judgments."

lying reasons supporting it. Both parties here believe that they are disseminating the political opinion so essential to a functional democracy. The need for such uninhibited opportunity of conflicting opinion has been given expression since the debates which led to the creation of our Federal Constitution.

"Let it be recollected, lastly, that the right of electing the members of the government constitutes more particularly the essence of a free and responsible government. The value and efficacy of this right depends on the knowledge of the comparative merits and demerits of the candidates for public trust, and *on the equal freedom, consequently, of examining and discussing these merits and demerits* of the candidates respectively." Madison's Report on the Virginia Resolutions, Elliot's Debates, Vol. IV, 585. (Emphasis supplied.)

The language quoted in the concurring opinion of Mr. Justice Goldberg in New York Times Co. v. Sullivan, supra, is a contemporary account to the same effect, 376 U.S. 254, 297, at 302, 84 S.Ct. at 738, 11 L.Ed.2d 686, 718, at 721:

" '[O]ne main function of the First Amendment is to ensure ample opportunity for the people to determine and resolve public issues. Where public matters are involved, the doubts should be resolved in favor of freedom of expression rather than against it.' Douglas, The Right of the People (1958), p. 41."

The extent to which this need is given deference is shown by the following:

"[I]t is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast and the advantages derived are so great, that they more than counterbalance the inconvenience of private persons whose conduct may be involved

* * *." Coleman v. MacLennan, 78 Kan. 711, at 724, 98 P. 281, at 286, 20 L.R.A.,N.S., 361 (1908).

Arrayed against these compelling reasons for an early trial, made more so by the approaching national elections and the need for an informed electorate, is the inconvenience which will be caused to plaintiff's counsel by forestalling a long-planned vacation.

While it is the custom of the courts to accommodate attorneys at every opportunity in matters of this kind, as indeed the Court has done on several occasions in this very case, the facts before me regrettably do not admit of such an accommodation.

Plaintiff's counsel indicates that he had no notion that the case would be placed on the docket so quickly. However, an examination of the transcript of the hearing on July 15 clearly reveals that this Court indicated to both counsel that its docket contained a number of open dates and that it was eager to get this case into a trial posture as soon as possible.

Despite this, and despite the order of this Court that the parties be prepared for pretrial by August 25, the case being subject to call at any time subsequent to pretrial, the first notice to this Court of a rather extended vacation was given at pretrial. Considered in this light, plaintiff's counsel had a duty at the time of the July 15 hearing to give notice to the Court of his plans, and failure to do so now bars objection on that ground.

Even absent these clear evidences of intent to move the case on at any early date, the subject matter itself provides reason enough for this decision. The convenience of attorneys is always subject to their role as representatives of the individuals whose rights are at issue. In the instant case, where the determination of those rights involves a question of such paramount importance as freedom of expression, and where its exercise is effectively stifled until the outcome of the suit, this Court reluctantly denies the request to postpone the trial date, and

hereby orders that this case come on for trial on October 14, 1964.

While there is a quantity of exhibits to be examined by the plaintiff, this should not present too great a burden, since it must be presumed that any commentator who speaks with authority, as Mr. Smoot does, has already investigated his topics somewhat thoroughly, and should be able to give able assistance to his counsel on these exhibits.

For the reasons stated, I am issuing an order for trial pursuant to and concurrent with this opinion.