VILLAGE OF GRAFTON, APPELLANT, *v.*
AMERICAN BROADCASTING COMPANY ET AL., APPELLEES.

(No. 3021—Decided November 26, 1980.)

*Mr. Ford L. Noble,* for appellant.

*Messrs. Calfee, Halter & Griswold* and *Mr. Terence J. Clark,* for appellees:

VICTOR, J.  This is an action for defamation which was brought by the appellant, the village of Grafton, against the appellees, the American Broadcasting Company (ABC) and the Scripps-Howard Broadcasting Company (Scripps-Howard). Scripps-Howard is the licensee of WEWS-TV, Channel 5 in Cleveland, an ABC affiliate.

At 10:00 p.m. on March 29, 1979, ABC broadcast an hour-long documentary entitled "The Killing Ground." It was carried in this area by WEWS-TV. The program dealt generally with the problem of hazardous chemical waste dumps in the United States and focused on several dumps in particular.

In its complaint, the appellant alleged that the program contained a statement that the village of Grafton is "one of the

twenty most polluted cities in the Midwest," and that a chemical waste disposal facility is operated within the village. The complaint went on to charge that:

"In making the said accusations, Defendants did intend to mean that the Village of Grafton invites polluters to operate within its corporate limits, fails to enforce any type of anti-pollution standards, and in general creates or allows to be created an unwholesome environment in which to live or conduct business."

$500,000 in compensatory damages and $500,000 in punitive damages were demanded. The appellees denied these allegations.

A complete transcript of "The Killing Ground" was filed as an exhibit in the court below. The transcript shows that the alleged statement was *not* made, and that there was no audio mention of Grafton, Ohio, during the program. What actually occurred was that, at the end of the show, in order to make the point that there were other dangerous chemical dumps, besides the ones shown on the program, the narrator said:

"So this and other deadly dumping grounds across the country remain. * * * These * * * according to government sources * * * are the location of some of the most dangerous."

This statement was accompanied by a "moving list" or "crawl" of 54 locations; one of these was Grafton, Ohio. The appellant admitted these facts during discovery, but the complaint was not amended.

The appellees filed a motion to dismiss, which the trial court granted. The court held that the appellant lacked standing to bring the action.

### Assignment of Error

"It was error for the trial court to hold that, because of appellant's status as a municipal corporation, it lacks standing to maintain a suit for slander of its property."

Appellant characterizes the action as one for slander of property, although the complaint sounded in defamation. Although it is true that pleadings may be retroactively amended to conform to the evidence, Civ. R. 15(B), the evidence here would not support such an action because no specific property of appellant's was mentioned in the program. Accordingly, we continue to treat the action as one for defamation, and do not

reach the question of whether a municipality may maintain an action for slander or disparagement of *property*.

## I.

There have been few reported cases involving claims of defamation by a municipality. See, generally, Annotation 45 A.L.R. 3d 1315. Apparently, the first was a British case, *Mayor, Aldermen, & Citizens of Manchester* v. *Williams* (1891), 1 Q.B. 94. The city brought an action for libel against the writer of a letter to the editor of a newspaper, wherein he charged corruption in the city government. In a brief opinion, the court held that " * * * [a] corporation may sue for a libel affecting property, [but] not for one merely affecting personal reputation. * * * " *Id.*, at 96. In arriving at this conclusion, the court seems to have adopted the reasoning of the defendant, who argued that a corporation can have no personal character to be injured since only the individuals composing a corporation can be guilty of corruption, and not the corporation itself.

The leading American case is *Chicago* v. *Tribune Co.* (1923), 307 Ill. 595, 139 N.E. 86. The defendant newspaper had published a series of articles in which it was charged, *inter alia*, that the city was bankrupt or nearly so, that it's credit was not good, and that it was in default and on the brink of receivership. The city brought an action for defamation based on the facts that it owned property such as public streets and bridges, a waterworks system, and police and fire equipment; that it purchased a large amount of property and supplies each year; that it was often necessary to purchase these materials either on credit or through bond issues; and that the Tribune's attacks on the financial integrity of the city had damaged the city's credit rating and impaired its ability to market its municipal bonds.

The Illinois Supreme Court concluded that, while at English common law there was some logic in prosecuting critics of government, since a hereditary monarch is not responsible to the people and can, therefore, do no wrong, that theory has no basis in this country; the court stated:

" * * * When the people became sovereign, as they did when our government was established under our constitution and the ministers became servants of the people, the right to discuss government followed as a natural sequence. * * *

[S]ince the people are sovereign and since the magistrates are servants of the people the magistrates can do wrong, and the people have a fundamental right to criticise them and to expose their inefficiency and corruption so that they may be displaced. It is one of the fundamental principles, therefore, of the American system of government, that the people have the right to discuss their government without fear of being called to account in the courts for their expressions of opinion. * * * " 307 Ill., at 601-602, 139 N.E., at 88.

The court also stated that all criticism of the government by the people in the exercise of their sovereignty, short of sedition, is absolutely privileged. 307 Ill., at 606-607, 139 N.E., at 90.

The court then turned its attention to Chicago's argument that the articles were not political criticism, but rather defamed the city in its proprietary capacity:

" * * * While for certain limited purposes it is often said that a municipality owns and operates its public utilities in its capacity as a private corporation and not in the exercise of its powers of local sovereignty, yet because of its proprietary rights it does not lose its governmental character. * * * It is manifest that the more so-called private property the people permit their governments to own and operate, the more important is the right to freely criticise the administration of the government. As the amount of property owned by the city and the amount of public business to be transacted by the city increase, so does the opportunity for inefficient and corrupt government increase and the greater will be the efforts of the administration to remain in control of such a political prize. The richer the city the greater the incentive to stifle opposition. In so far as the question before us is concerned, no distinction can be made with respect to the proprietary and governmental capacities of a city." 307 Ill., at 609-610, 139 N.E., at 91.

In a ringing phrase, which has been much quoted since, the court concluded its decision with the following words:

" * * * This action is out of tune with the American spirit and has no place in American jurisprudence." 307 Ill., at 610, 139 N.E., at 91.

*Chicago* v. *Tribune Co., supra,* has been the foundation upon which every other American case on the subject has been

built. The New York Supreme Court was correct when it said that: " * * * [N]o American court which has considered the question has reached a result contrary to that of *City of Chicago* v. *Tribune Co.* * * * ." *Capital District Regional Off-Track Betting Corp.* v. *Northeastern Harness Horsemen's Assn.* (1977), 92 Misc. 2d 232, 234, 399 N.Y. Supp. 2d 597, 598. *Chicago* v. *Tribune Co., supra,* was also cited with approval by the United States Supreme Court in *New York Times Co.* v. *Sullivan* (1964), 376 U. S. 254, 291.

*Albany* v. *Meyer* (1929), 99 Cal. App. 651, 279 P. 213, was the next municipal defamation case, and arose from an incident similar to the one in *Chicago* v. *Tribune Co., supra.* The court noted the statement in *Mayor, Aldermen, & Citizens of Manchester* v. *Williams, supra,* that a corporation might sue for libel affecting property; however, the court construed that statement to refer to a private corporation, rather than a municipal corporation. The court, approving the reasoning of *Chicago* v. *Tribune Co., supra,* affirmed the judgment for the defendant.

A 1972 Tennessee case provides the closest parallel to the case at bar. In *Johnson City* v. *Cowles Communications, Inc.* (Tenn. 1972), 477 S.W. 2d 750, the plaintiff sued the defendant over an article which appeared in *Look Magazine* and was, therefore, published to a nationwide audience. The article concerned recent events in Johnson City, and the plaintiff alleged that the article portrayed Johnson City as a place which represented everything terrible and to be avoided, where the laws were not enforced, and as a place where industry refused to locate. The city further alleged that, as a result of the article, it had lost income and the confidence of the public, and that both the city and its residents had been scandalized in the eyes of the world.

The Supreme Court of Tennessee ruled in favor of the defendant. The case was resolved partly on statutory grounds; the court held that a city was not a "person" within the meaning of the Tennessee libel statutes, and, therefore, had no reputation which could be defamed. *Id.,* at 753. However, the court went on to hold, quoting extensively from *Chicago* v. *Tribune Co., supra,* that criticism of government is absolutely privileged:

"If this action could be maintained, every report of corrup-

tion, graft and thievery, most of which cannot be based on hard evidence, sufficient to convict, would be smothered by the threat of an expensive suit. * * * It is difficult to imagine anything more destructive of democratic government than the power in the hands of a corrupt government to stifle all opposition by free use of the public treasury to silence critics by suit. This Court is satisfied that this is not the law under which we live, and trust that it will never be the law. * * *

" * * * [W]e hold that the article in question is absolutely privileged for the reason that any citizen, private or corporate, of these United States has an absolute privilege to make any statements, excepting only treasonable utterances, concerning a government, city or otherwise. Government has no capacity to apply either criminal or civil sanctions to the speaker or writer, without regard to the falsity or malice of the comment, for such sanctions are forbidden under the First and Fourteenth Amendments to the Constitution of the United States." 477 S.W. 2d, at 754.

Defamation suits by quasi-governmental entities have fared no better. Since these bodies are similar to municipal corporations and possess many of the same powers, the courts have applied the *Chicago* v. *Tribune Co.* rule to bar claims of harm to their proprietary interests. See *Progress Development Corp.* v. *Mitchell* (N.D.E.D. Ill. 1963), 219 F. Supp. 156 (park district) and *Capital District Regional Off-Track Betting Corp.* v. *Northeastern Harness Horsemen's Assn., supra* (public benefit corporation).

In the instant case, Grafton (the appellant) avers, in its complaint, that:

" * * * [T]he plaintiff operates a municipally owned water system, a sewer system and an electric utility, and has recently made substantial capital expenditures to extend * * * sanitary and storm sewer lines into undeveloped areas of the corporation, to purchase and install electric transforming equipment, and other major capital improvements, which expenditures can only be recovered by the continued development of the municipality and the sale of its utility services."

Appellant states further in its brief that it has suffered a decline of growth and consequent loss of revenue to these proprietary activities due to the broadcast.

These allegations are quite similar to those made by the

city of Chicago, noted earlier in *Chicago* v. *Tribune Co., supra.* We have seen that the *Chicago* v. *Tribune Co.* rule is based on a privilege to criticize the political operations of government. Appellant argues that the alleged defamatory statement here was not a criticism of government, but rather a slander on its proprietary operations, and that the *Chicago* v. *Tribune Co.* rule, therefore, does not apply.

However, the language of *Chicago* v. *Tribune Co., supra,* while arguably broader than was necessary to decide that case, specifically addressed that contention:

" * * * In so far as the question before us is concerned, no distinction can be made with respect to the proprietary and governmental capacities of a city." 307 Ill., at 610, 139 N.E., at 91.

Later cases have likewise refused to make any exceptions for proprietary activities. *Progress Development Corp.* v. *Mitchell, supra; Capital District Regional Off-Track Betting Corp.* v. *Northeastern Harness Horsemen's Assn., supra.*

We believe that the *Chicago* v. *Tribune Co.* principle is sound and that it is broad enough to encompass, not just criticism of government in the sense of political discussion, but any statements about government or governmental entities. Like any per se rule, this may occasionally seem unfair in individual cases; yet, if unfairness there must be, we deem it preferable that it should be on the side of freedom of speech.

We, therefore, hold that the statement herein was privileged.

## II.

"In Ohio, libel is defined as a false and malicious publication made with the intent to injure a person's reputation or expose him to public hatred, contempt, ridicule, shame or disgrace, or to affect him adversely in his trade or profession. * * * " (Citations omitted.) *Thomas H. Maloney & Sons, Inc.,* v. *E. W. Scripps Co.* (1974), 43 Ohio App. 2d 105, 107. See, also, Restatement of Torts 2d, Section 559.

Can it be said that a municipal corporation is a "person," and, hence, possesses a reputation which may be defamed?

For purposes of R. C. Title VII (Municipal Corporations), " '[p]erson' includes a private corporation." R. C. 701.01(A). However, Ohio's libel statute (R. C. 2739.01) does not clearly require a *personal* plaintiff, as did the Tennessee statute which

was construed in the *Johnson City* case, *supra* (477 S.W. 2d), at 752. Although R. C. 2739.01 refers to the plaintiff as "him," R. C. 1.43(B) provides that "[w]ords of one gender include the other genders."

Perhaps the leading case on this aspect of the problem is *Louisiana* v. *Time, Inc.* (La. App. 1971), 249 So. 2d 328, a case in which the state brought suit over an allegedly defamatory magazine article. It was held that the state is not a person with respect to defamation actions and, thus, has no personality which may be defamed:

" ' * * * [T]he Court cannot accord with plaintiff's conclusion that the state is a person for purposes of the law of defamation and libel. It is the opinion of this Court that a state constitutes a concept or idea, "a sort of intangible sovereignity [sic] (which) legally speaking * * * cannot be assaulted, slandered, or injured as can an individual with respect to a personality which it does not possess. ['] * * * Under the American philosophy of government, the state is a creature of the people and does not exist separate and apart from the people.* * * As long as ultimate sovereignity [sic] resides in the people, the state cannot be thought of as having a separate personality and, therefore, cannot be said to have been defamed.' " *Id.*, at 329.

Relying on the *Chicago* v. *Tribune Co.* case, *supra*, the court concluded that the state had no cause of action for defamation.

We believe that this reasoning is equally applicable to municipalities. A municipal corporation is as much a governmental entity, and, therefore, the embodiment of the people, as the state. Moreover, a municipality, as a subdivision of the state, could not possess any higher rights than the state itself. See *United States* v. *Fox* (1877), 94 U. S. 315, 321 ("person" does not include the federal government), and the decision of this court in *Troutman* v. *Eichar* (1940), 64 Ohio App. 415, 421 (the word "person" does not ordinarily signify a sovereign government).

We, therefore, conclude that a municipal corporation is not a person, has no reputation which may be defamed, and, therefore, has no standing to maintain an action for defamation.

## III.

There is a third, equally valid, ground upon which our decision may rest: the common law doctrine of "record" privilege. This is the privilege to report governmental proceedings which may contain defamatory matter, and is summarized in Restatement of Torts 2d, Section 611, at page 297, as follows:

"The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported." See, generally, Prosser on Torts (4 Ed. 1971), at pages 830-833, Section 118; Note, Privilege to Republish Defamation, 64 Colum. L. Rev. 1102.

The rationale for this privilege is the public interest in the free flow of information necessary for self-government; it thus protects interests similar to those underlying the First Amendment. Comment, Constitutional Privilege to Republish Defamation, 77 Colum. L. Rev. 1266. See, also, Restatement of Torts 2d, Scope Note following Section 592A.

Heretofore, record privilege has been invoked mainly in the context of judicial proceedings; that is, litigation and commentary have focused on the right to make a truthful report of such things as the charges against a defendant or defamatory statements made during court testimony. See, e.g., Cincinnati Gazette Co. v. Timberlake (1860), 10 Ohio St. 548; Driscoll v. Block (1965), 3 Ohio App. 2d 351; Note, 55 Tex. L. Rev. 1103.

However, the privilege also applies to the reporting of defamatory material in executive or administrative proceedings:

" * * * The privilege covered in this Section extends to the report of any official proceeding, or any action taken by any officer or agency of the government of the United States, or of any State or of any of its subdivisions. * * * The filing of a report by an officer or agency of the government is an action bringing a reporting of the governmental report within the scope of the privilege." Restatement of Torts 2d, Section 611, Comment d, at page 299.

This is the situation which we find in the present case. ABC's statement was that "according to government sources," Grafton, Ohio, was the location of a deadly chemical waste dump. ABC maintains that this was based on informa-

tion contained in a report issued by the United States Environmental Protection Agency—*information which has turned out to be erroneous*. Nevertheless, it appears that ABC did nothing more than make a truthful report of matter contained in an official governmental report (although the report was not introduced in evidence), and the statement was, therefore, privileged.

The instant case also falls within the record privilege to republish an injurious falsehood, defined, for our purposes, as a false statement which does harm to the pecuniary interests of another and causes pecuniary loss. Restatement of Torts 2d, Section 623A, Comment *a*. Section 646A of the Restatement of Torts 2d states that the privilege to republish injurious falsehoods exists coextensively with the privilege stated in Section 611 of the Restatement of Torts 2d, concerning defamatory statements. Illustration 5 to Section 646A of the Restatement of Torts 2d, at page 365, is of particular interest:

"An official governmental report on a particular type of products states that A's product has specified defects in it. B Newspaper accurately publishes the report. Even though the statement in the report as to A's product is erroneous, B's publication in the newspaper is privileged. (Compare §611)."

In Ohio, the record privilege has been codified with respect to state governmental proceedings. R. C. 2317.04 provides that "[t]he publication of a fair and impartial report of * * * proceedings * * * before state or municipal executive bodies * * * [or] boards, * * * or a fair synopsis of * * * [the reports issued by them, is] privileged, unless it is proved that such publication was made maliciously." Thus, in the only Ohio case similar to the one at bar, it was held that publication of a coroner's report by a newspaper was privileged under this statute, even though it contained false information about the plaintiff. *Painter* v. *E. W. Scripps Co.* (1957), 104 Ohio App. 237.

We see no reason why this principle should not equally apply to truthful republication of statements contained in reports issued by the federal government.

It should also be noted that executive or administrative officers of the United States have an absolute privilege to publish defamatory matter concerning another in the perfor-

mance of their official duties. *Barr* v. *Matteo* (1959), 360 U. S. 564; Restatement of Torts 2d, Section 591. The object, of course, is to free such officers from the threat of civil liability which might otherwise inhibit the conscientious performance of their duties. It would, indeed, be anomalous if the maker of a defamatory statement were privileged but a news agency which merely published a true account of the statement could be subject to liability.

"The public interest in 'robust' debate underlying the *New York Times* privilege is present with no less force when a statement is republished than when it is originally uttered. If freedom of public debate is to be meaningful, the dissemination of such debate must also be privileged to insure that it is heard by all. Thus, as *New York Times* and other cases have seemingly recognized, the republisher is entitled to at least the same protections as the original speaker." (Footnotes omitted.) Comment, *supra*, 77 Colum. L. Rev., at 1273.

In fact, with this interest in mind, recent case law has expanded the record privilege beyond reports of governmental proceedings to encompass truthful reports of defamatory statements made by private, well-known organizations in discussing matters of public controversy. See *Edwards* v. *National Audubon Society, Inc.* (C.A. 2, 1977), 556 F. 2d 113, certiorari denied (1977), 434 U. S. 1002.

Accordingly, the judgment of the Court of Common Pleas of Lorain County is affirmed.

*Judgment affirmed.*

BELL, P. J., and HUNSICKER, J., concur.

HUNSICKER, J., retired, of the Ninth Appellate District, was assigned to active duty under authority of Section 6(C), Article IV, Constitution.