FLOTECH, INC., and Fluoramics, Inc.,
Plaintiffs, Appellants,

v.

E.I. DU PONT de NEMOURS &
COMPANY, Defendant,
Appellee.

No. 86–1146.

United States Court of Appeals,
First Circuit.

Argued Sept. 9, 1986.

Decided March 18, 1987.

David P. Rosenblatt with whom Lawrence G. Cetrulo, Constance M. McGrane and Burns & Levinson, Boston, Mass., were on brief, for plaintiffs, appellants.

George H. Lewald with whom Pierce O. Cray, Raymond W. Henney, Paul J. O'Donnell and Ropes & Gray, Boston, Mass., were on brief, for defendant, appellee.

Before COFFIN, Circuit Judge, WISDOM *, Senior Circuit Judge, and BREYER, Circuit Judge.

COFFIN, Circuit Judge.

Plaintiffs Fluoramics, Inc., and Flotech, Inc., the manufacturer and former principal distributor, respectively, of Tufoil, sued E.I. Du Pont de Nemours & Company for product disparagement and for deceptive trade practices in violation of Mass. Gen.Law Ann. ch. 93A. Following extensive pretrial discovery, the district court granted summary judgment for defendant. 627 F.Supp. 358. We affirm.

## I.

Plaintiffs' product Tufoil is a motor oil additive containing polytetrafluoroethylene (PTFE). Defendant sells PTFE under its tradename "Teflon" and as untrademarked PTFE micropowder. During a period preceding February 1980 Fluoramics purchased PTFE from Du Pont and another company, ICI Americas, and it referred to both Teflon and Du Pont on the Tufoil label.

* Of the Fifth Circuit, sitting by designation.

On February 1, 1980, Du Pont issued the following press release:

Wilmington, Del., Feb. 1—The Du Pont Company today announced it will immediately discontinue supplying its "TEFLON" fluorocarbon resins or untrademarked fluorocarbon micropowder for use as ingredients in oil additives or oils for lubricating internal combustion engines.

The decision was reached after a review of data available within the Company and from outside sources showed, in Du Pont's opinion, that these resins are not useful in such products.

During the past several years, numerous oil additives or engine treatment products have been introduced in the United States and abroad. Promotion for some of these products claims improved engine performance, increased fuel economy and reduced emissions, citing Du Pont's "TEFLON" fluorocarbon resin as the active agent.

As the number of oil additives products has increased, so have the inquiries Du Pont has received as to the utility of "TEFLON" resins in such applications. The Company gathered data from within the Company and outside sources to assess the claims regarding "TEFLON" fluorocarbon resins.

"TEFLON" is Du Pont's trademark for its polytetrafluoroethylene (PTFE) products.

Plaintiffs filed this action on November 1, 1983. They claim that Du Pont severely injured them in their reputation and sales by allegedly impugning Tufoil through the press release. In granting summary judgment for defendant, the district court ruled that plaintiffs' claims based on the initial February 1, 1980 press release were barred by the Massachusetts three-year statute of limitations for tort actions. It also found as a matter of law that subsequent republications of the press release were nondefamatory "opinion" and in any event not "of or concerning" the plaintiffs' product, and thus not actionable. The court further held that the Chapter 93A claims were

barred by the then existing "interstate commerce exemption" to Chapter 93A, *see* Mass.Gen.Laws Ann. ch. 93A § 3(1)(b) (West Supp.1983–84), and that the provision's repeal was not to be given retroactive effect.

## II.

Plaintiffs raise a number of points on appeal, including whether plaintiffs were public figures—an issue raised to, but not reached by, the district court—and whether the statute of limitations bars certain of plaintiffs' claims. We shall discuss only those issues necessary to our conclusion that the press release did not contain actionable defamatory statements.[1]

██ The district court determined that the press release was not defamatory because its contents constituted opinion rather than fact. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974); *Bose Corp. v. Consumers Union*, 692 F.2d 189, 193–94 (1st Cir.1982), *aff'd*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *Aldoupolis v. Globe Newspaper Co.*, 398 Mass. 731, 733, 500 N.E.2d 794 (1986); *Cole v. Westinghouse Broadcasting Co.*, 386 Mass. 303, 308–10, 435 N.E.2d 1021 (1982). We think this a close and difficult question which, as we shall explain below, we need not answer. Under Massachusetts law,[2] a court attempting to distinguish between fact and opinion examines " 'the statement in its totality in the context in which it was uttered or published.' " *Cole*, 386 Mass. at 309, 435 N.E.2d 1021 (quoting *Information Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir.1980)). As part of this scrutiny,

> "The court must consider all the words used, not merely a particular phrase or

sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published."

*Id.* Application of this test to the Du Pont press release produces an inconclusive result. *See Bose Corp.* at 194 ("The determination of whether a statement is one of opinion or fact, however, is difficult to make and perhaps unreliable as a basis for decision.") On the one hand, certain of the phraseology employed in the press release strongly—or explicitly—suggests opinion. The reference in the release to Du Pont's review of "data *available* within the Company and from outside sources" indicates that Du Pont was not releasing conclusive studies, but was basing its comments on possibly limited data. We think such a restrained description of the support for the conclusion expressed in the press release is more consistent with a statement of opinion than with a statement of fact. Indeed, the cautionary phrasing in that part of the sentence is underscored by the express statement that the data showed—*"in Du Pont's opinion "*—that the resins are not useful in oil additive products like Tufoil. *See Information Control*, 611 F.2d at 784 ("Where the language of the statement is 'cautiously phrased in terms of apparency' ..., the statement is less likely to be understood as a statement of fact rather than as a statement of opinion.")

On the other hand, however, the restrained tone of the press release could be viewed as giving the impression of a detached statement of facts. Although the efficacy of Teflon-based oil additives was

1. This Court has applied principles of defamation law to product disparagement claims. *Bose Corp. v. Consumers Union*, 692 F.2d 189 (1st Cir.1982), *aff'd*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

2. Although the question whether an allegedly defamatory statement is protected opinion ultimately is a question of federal constitutional law, *see Ollman v. Evans*, 750 F.2d 970, 975 n. 8

(D.C.Cir.1984) (en banc), we conclude that Massachusetts law is at least as protective as federal law on this issue and it thus provides the appropriate framework for this diversity case. *See Ollman*, 750 F.2d at 979 (adopting "totality of the circumstances" approach to the fact-opinion issue); *Information Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir.1980) (same).

an issue of public interest, we think the context here was not one " 'in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, [so that] language which generally might be considered as statements of fact may well assume the character of statements of opinion.' " *Cole*, 386 Mass. at 310, 435 N.E.2d 1021 (quoting *Gregory v. McDonnell Douglas Corp.*, 17 Cal.3d 596, 601, 131 Cal.Rptr. 641, 552 P.2d 425 (1976)). In fact, since Du Pont's decision to stop selling Teflon for oil additives could be viewed as against its economic interest, the specific disclaimer that the press release represents opinion probably carries less weight than it would in other contexts.

▮ Even if more reasonably construed as opinion than as fact, the language of the release could be viewed as within the scope of Restatement (Second) of Torts § 566 (1977), which states,

A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.

*See Aldoupolis*, 398 Mass. at 735, 500 N.E.2d 794; *Pritsker v. Brudnoy*, 389 Mass. 776, 778–79, 452 N.E.2d 227 (1983). The rationale of this rule is that when an opinion is based on unstated or unassumed facts, the audience can only presume that the publisher of the statement is asserting the facts to support the opinion as well. Thus, the effect is the same as if the publisher had stated the facts, and the publisher may be liable if those facts are defamatory. In this case, a logical reading of Du Pont's statement about available data is that the company has test results showing that Teflon does not work in oil additive products and, on the basis of those undisclosed statistics, it is Du Pont's opinion "that these resins are not useful in such products." The actionable element of this

statement, then, would be the undisclosed specific "data" that Du Pont claimed to possess showing the ineffectiveness of the oil additives like Tufoil. If, in fact, Du Pont had no such data, or the test results actually favored the oil additives, Du Pont might, under this analysis, be found liable for defaming Tufoil.

In some circumstances, the inconclusive nature of the press release would require that a jury be assigned the task of determining whether the challenged statements amount to fact or opinion. The issue is

a question of law if the statement unambiguously constitutes either fact or opinion.... However, if a statement is susceptible of being read by a reasonable person as either a factual statement or an opinion, it is for the jury to determine.

*Aldoupolis*, 398 Mass. at 733, 500 N.E.2d 794 (citation omitted). *See also Lyons v. New Mass Media, Inc.*, 390 Mass. 51, 59, 453 N.E.2d 451 (1983); *Myers v. Boston Magazine Co.*, 380 Mass. 336, 339–40, 403 N.E.2d 376 (1980). Summary judgment cannot be set aside on this ground, however, because even if Du Pont's press release were viewed as containing statements of fact regarding plaintiffs' product, we conclude that its communication was conditionally privileged.[3]

▮ Under Restatement (Second) of Torts § 594 (1977), an otherwise defamatory publication is conditionally privileged if it is reasonable to believe that the information to be published affects a sufficiently important interest of the publisher and publication will serve to protect that interest. Massachusetts courts have recognized a conditional privilege if the publication is reasonably necessary to the protection or furtherance of a legitimate business interest. *Bratt v. International Business Machines Corp.*, 392 Mass. 508, 512–13, 467 N.E.2d 126 (1984). *See Retailers Commercial Agency, Inc.*, petitioner, 342 Mass. 515, 520, 174 N.E.2d 376 (1961). A publica-

---

**3.** For purposes of this discussion, we assume, without deciding, that Du Pont's statements were "of and concerning" Tufoil, a requirement for showing defamation. *See Rosenblatt v. Baer*, 383 U.S. 75, 81–82, 86 S.Ct. 669, 673–74, 15 L.Ed.2d 597 (1966). *New England Tractor-Trailer Training of Connecticut, Inc. v. Globe Newspaper Co.*, 395 Mass. 471, 473–74, 480 N.E.2d 1005 (1985).

tion is similarly protected if the publisher reasonably believes that the information to be published will affect a sufficiently important interest of the recipient and the recipient is a person whom the publisher has an obligation to inform. Restatement (Second) of Torts § 595 (1977). Conditional privileges such as these represent a balance between "the interest of the defamed person in the protection of his reputation [and] the interests of the publisher, of third persons and of the public in having the publication take place." *Id.* § 595 Comment (b). *See also Bratt,* 392 Mass. at 515 n. 11, 467 N.E.2d 126 (objective of conditional privilege is to promote "the free flow of information to further a legitimate private or public interest"). The "condition" on the privilege is that the publication not be abused. *Bratt,* 392 Mass. at 514, 467 N.E.2d 126; *Tosti v. Ayik,* 386 Mass. 721, 726, 437 N.E.2d 1062 (1982); Restatement (Second) of Torts § 595 Comment (a) (privilege abused if statement published despite knowledge of or reckless disregard for the falsity of the statement, if published for an improper purpose (such as competition for prospective pecuniary advantage), or if repeated excessively); Restatement (Second) of Torts § 599 (1977).

It seems clear to us that a company's statement in good faith that it views its own product as ineffective for a particular purpose may fall within both the "business interest" and "public protection" privileges—even if the statement by implication can be understood to comment on the effectiveness of a third-party's product. A company must have the freedom to protect its image and that of its products by deciding not to sell a particular item for a purpose that the company has come to believe is inappropriate. This right is even more compelling if the company fears possible product liability resulting from the suspect use of its product. Moreover, it is reasonable for a company whose reputation is based on the high quality performance of

its goods to believe it necessary to announce this decision to the public in order to erase the tarnish and alleviate the possible economic harm from the inappropriate use.

■ We conclude that there is no genuine issue of material fact as to whether Du Pont's situation fits within this scenario. Plaintiffs suggest no untoward motive on the part of Du Pont, instead emphasizing that Du Pont had engaged in "a strategy to destroy the PTFE oil additive market"—an allegation fully consistent with Du Pont's claimed interest in protecting itself and the public from an ineffective application of its product. Du Pont had received a number of queries concerning oil additives and the use of Teflon in them. For example,[4] the record contains a copy of a letter from the Consumer Office of the Denver District Attorneys' office, written in November 1979, asking whether Du Pont had tested any teflon-based additives and requesting results from such tests. The letter also asked for confirmation that Du Pont had given permission for the use of Teflon in such products. Another letter from a camp director in Missouri sought information on whether a certain oil additive (not Tufoil) could live up to its claims regarding engine performance and whether side effects could be expected from use of the product. The letter, which noted that the product based its claims on Du Pont Teflon, stated:

> Because of the respect that I have for DuPont and its products, it seemed the only way to determine the answers to these two questions was to try to get them from DuPont.

In addition to concern about Du Pont's consumer goodwill generated by these kinds of inquiries, Robert Blanchfield, the Du Pont employee responsible for issuing the press release, stated in his affidavit that he developed concern about possible product liability arising from the use of PTFE in the additives. The affidavit states

---

**4.** The parties' Joint Pretrial Memorandum listed specific objections by plaintiffs to the documents we cite as examples, and there is therefore no certainty that these documents would constitute admissible evidence at trial. Our conclusion does not depend on their admissibility, however, and we refer to them here only to illustrate why a company in Du Pont's situation should have a conditional privilege to comment upon its own products.

that he feared the possibility of PTFE particles clogging an engine's oil filters, and thus causing engine failure. According to the affidavit, this particular concern was exacerbated by his awareness that some oil additive manufacturers were promoting their products for use in airplanes.

Not only did Du Pont have apparently valid reasons for wishing to issue a press release, but it also did so in a manner further supporting the application of a conditional privilege. Despite the fact that direct questions were asked about the efficacy of the oil additives, Du Pont's press release was drafted to comment only upon the value of Du Pont's own product. No oil additive was mentioned by name. Moreover, even if the press release were capable of being construed as a factual statement about oil additives rather than an opinion about Teflon, the opinion label on the communication renders it far less authoritative than an outright statement that either Teflon or the oil additives did not improve engine performance. Thus, after weighing the competing interests between Du Pont and plaintiffs, we conclude that Du Pont's publication of its decision to withdraw PTFE from the oil additive market was conditionally privileged under Restatement (Second) of Torts § 594. *See Bratt*, 392 Mass. at 512–13, 467 N.E.2d 126. If Du Pont's statement about the ineffectiveness of Teflon in oil additive products were true, the company would have a substantial interest in disassociating itself from the false claims of oil additive manufacturers. And even if the statement turned out to be false, the inconclusive nature of the press release and the absence of reference to any particular product, other than Du Pont's own, reduced the likelihood of injury to plaintiffs.

Section 595 of the Restatement is equally applicable to this situation. Du Pont was aware that oil additive manufacturers were advertising significant improvements in engine performance based largely on the presence of Du Pont's Teflon in their products. If Du Pont determined that Teflon was ineffective for such purposes, it would be reasonable for the company to believe it was important to notify the public of that information. In essence, Du Pont would be fulfilling an arguable duty to prevent what it perceived to be consumer fraud. *See* § 595(b) ("the recipient is ... a person to whom ... publication is otherwise within the generally accepted standards of decent conduct") and Comment j (it is significant that the defamatory matter is published in response to a request by the person whose interest is concerned).

■ We therefore conclude that the record suggests no genuine factual issue concerning the *applicability* of a conditional privilege. This, however, does not end the case. We also must determine whether the record, viewed in the light most favorable to plaintiffs, demonstrates any genuine factual dispute regarding Du Pont's *abuse* of the privilege. Plaintiffs allege that a reasonable jury could find that Du Pont acted with "actual malice"—that the company knew that its statements about Tufoil were false or at least that it acted with reckless disregard of their truth or falsity. Plaintiffs have the burden of showing with "clear and convincing" evidence that the defendant entertained serious doubts as to the veracity of the statements, *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 511 n. 30, 104 S.Ct. 1949, 1965 n. 30, 80 L.Ed.2d 502 (1984).[5] Thus, the appropriate summary judgment question on this issue is "whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear

---

5. The standard and burden for showing actual malice have most often been articulated in the context of the constitutional requirement that a public figure who alleges defamation prove that the defendant acted with actual malice. *See Anderson v. Liberty Lobby, Inc.*, — U.S. —, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Bose Corp. v. Consumers Union*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). We see no reason to treat the actual malice requirement differently in this context. *See Bratt v. International Business Machines Corp.*, 392 Mass. 508, 515, 467 N.E.2d 126 (1984) ("The policy reasons behind the recognition of a conditional privilege impel us to conclude that whatever the manner of abuse, recklessness, at least, should be required.")

and convincing evidence or that the plaintiff has not." *Anderson v. Liberty Lobby, Inc.*, — U.S. —, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

■ We conclude that there is insufficient evidence in the record to meet the plaintiffs' considerable burden of showing actual malice. Plaintiffs properly focus on the actions of the two Du Pont employees with the primary roles in issuing the press release, Robert Blanchfield, the Marketing Manager for the PTFE Homopolymers Group, and John Imbalzano, Product Specialist and Product Program Coordinator for Du Pont's fine powder PTFE products in the PTFE Homopolymers Group. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 287, 84 S.Ct. 710, 729, 11 L.Ed.2d 686 (1964) ("the state of mind required for actual malice would have to be brought home to the persons in the [corporation's] organization having responsibility for the publication …"). Plaintiffs claim that a jury could infer malice by Blanchfield, who made the decision to issue the release, because of statements indicating his hostility toward their product and because he relied on only one employee's data in making his decision. Plaintiffs point specifically to a September 18, 1979, letter written by Blanchfield that contained a list titled "Snake-Oil Producers." Plaintiffs' product, Tufoil II, was at the top of the list. Plaintiffs also claim a jury reasonably could infer that another note written by Blanchfield to Imbalzano—containing only the question "Program to kill ready?"—referred to Du Pont's decision to disassociate itself from all motor oil additives.

Plaintiffs cite as further evidence of malice Blanchfield's failure to independently examine the effectiveness of motor oil additives and his reliance on the conclusions reached by Imbalzano in an October 26, 1979 memorandum. They claim Blanchfield had reason to doubt the sufficiency of Imbalzano's report because Imbalzano's conclusions regarding Tufoil were based on a two-year-old evaluation.[6] Moreover, plaintiffs claim, the report on Tufoil showed positive results. Finally, plaintiffs cite Du Pont's failure to publicly disseminate a March 10, 1980 letter that the company sent to Fluoramics following a meeting with Fluoramics representatives. The letter stated, in part:

> [W]e understand that the fluorcarbon product commercially purchased and required for "Tufoil" differs meaningfully from that which Du Pont supplies to the market place as TEFLON fluorcarbon resins or untrademarked micropowder, and is available only by special arrangement with ICI Americas. Because of this distinction, it appears that the active ingredients in "Tufoil" fall outside our recent press release which, you will recall, pertains solely to the fluorocarbon resins which Du Pont supplies to the marketplace.
>
> As we have informed you, we have not and do not plan to run any performance tests of your current product. Thus we can express no opinion as to its efficacy.[7]

We think no reasonable jury would find that these facts add up to clear and convincing evidence that Du Pont entertained

---

6. Du Pont had had discussions with Tufoil's inventor, Franklin G. Reick, before the product was marketed to the public, and the company evaluated Tufoil in connection with these talks. Although plaintiffs allege that Du Pont engaged in preliminary licensing negotiations at this time, the record leaves unclear Du Pont's intentions in evaluating the product. A Du Pont memo dated February 2, 1977, reported completion of the first phase of the company's Tufoil evaluation, with no "significant" changes shown in emissions, fuel economy, octane rating, acceleration or power. The memo then stated, "No further work on this material is planned." It appears that Du Pont's affirmative involvement with Reick and Tufoil ended at that time.

7. This letter suggests that plaintiffs, at least at one point, contended that Tufoil did not contain significant quantities of Du Pont resins. This fact would seem to indicate that the Du Pont press release could not be considered to refer to Tufoil. We overlook this possible inconsistency and assume that plaintiffs' argument is that their product did contain Du Pont ingredients, and thus that Tufoil was one of the oil additives mentioned in the press release as "citing Du Pont's 'Teflon' fluorcarbon resin as the active agent." At some time before 1980, as we noted at the beginning of this opinion, plaintiffs did purchase Teflon from Du Pont and included the Teflon trademark on the Tufoil label.

serious doubts as to the truth of its press release. At the most, they can be taken to suggest that on the basis of inadequate testing and the giving of insufficient weight to some positive reported results, Du Pont reached an erroneous decision to distance itself from the oil additive market. Even though, arguably, Du Pont's actions might be said to reflect some negligence, there appears no basis to support an inference of improper motive, for example, a motive to injure plaintiffs. Or, to stretch the evidence even farther, even if it could be said to suggest something more than negligence, it could not be said to rise to the level of being "clear and convincing."

Blanchfield's seemingly derogatory comments about the oil additive products are more consistent with a belief, as stated in his affidavit, that the statements in the press release were true. The failure to independently verify results reported by the company's product specialist is hardly indicative of carelessness. The October 26 report from Imbalzano to Blanchfield contained numerous attachments detailing various test results, including an Environmental Protection Agency evaluation of one oil additive (not Tufoil) showing no impact from use of the product. Even though the results on Tufoil showed slight improvements in certain performance areas, plaintiffs have in no way shown that those results make knowingly or recklessly untruthful the statement in the report that oil additives "do not significantly improve engine performance" or the statement in the press release that, "in Du Pont's opinion, ... these resins are not useful in such products." Imbalzano's report noted that he confirmed his statistical analysis with a member of Du Pont's engineering department who holds a doctorate in mathematics. Nor do plaintiffs' assertion of users' testimonials convincingly discredit Du Pont's statements based on the lack of statistically reliable proof of usefulness.

This situation is far different from that in *Lyons v. New Mass Media, Inc.*, 390 Mass. at 57, 453 N.E.2d 451, cited by plaintiffs, where the Supreme Judicial Court precluded summary judgment on the issue of malice, noting that " 'recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports' " (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968)). In *Lyons*, the reporter's two sources were both involved in disputes with the union allegedly defamed and thus obviously were not unbiased sources. There is no reason in this case for Blanchfield to have questioned the reliability of Imbalzano's information. Imbalzano had no apparent bias, and the materials attached to his reports uniformly indicated no or little effect from various oil additive products. That more extensive testing could have been done does not suggest reckless disregard for the truth of a statement that limited data showed no usefulness for the oil additives. We are hardpressed to say that, to avoid a finding of recklessness with regard to a less than conclusive statement about its own product, Du Pont was required to do more than it did. Indeed, if it were so required, the conditional privilege would be diminished to the point of vanishing.

We also find nothing suggestive of actual malice in Du Pont's failure to disseminate its March 10 letter to the public. The letter makes no affirmative statement about Tufoil, but simply states that if Tufoil is not making use of Teflon as supplied to the marketplace by Du Pont, it is not within the scope of the press release. The letter expressly states that the company has no view on Tufoil's efficacy. We think no reasonable juror could view Du Pont's failure to distribute this letter as indicating that the company entertained doubts about the accuracy of the press release. To the contrary, the letter implicitly confirms the original release while acknowledging that the release did not apply to a product not using Du Pont's fluorocarbon resin as the active ingredient.

What we said in *Bose Corp.*, 692 F.2d at 196, is equally applicable here:

> The subjective determination of whether [a defendant] in fact entertained serious doubts as to the truth of the statement may be proved by inference, as it would be rare for a defendant to admit

such doubts.... A court typically will infer actual malice from objective facts.... These facts should provide evidence of negligence, motive, and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice. Such evidence is lacking in this case. [Citations omitted.]

*The judgment of the district court is affirmed.*