**COLLEGE SAVINGS BANK, Plaintiff,**

v.

**FLORIDA PREPAID POSTSECONDARY EDUCATION EXPENSE BOARD, Defendant.**

**Civ. No. 95–4516 (GEB).**

United States District Court, D. New Jersey.

March 22, 1996.

Arnold B. Calmann, Saiber Schlesinger, Satz & Goldstein, Newark, NJ and David C. Todd, Garrett G. Rasmüssen, and Deborah M. Lodge, Patton Boggs, L.L.P., Washington, D.C., for Plaintiff College Savings Bank.

William B. Mallin, Lewis F. Gould, and Anne E. Hendricks, Eckert Seamans Cherin & Mellott, Marlton, NJ; Philadelphia, PA, for Defendant Florida Prepaid Postsecondary Education Expense Board.

## MEMORANDUM OPINION

GARRETT E. BROWN, Jr., District Judge.

This matter comes before the Court on the motion of plaintiff College Savings Bank to dismiss, pursuant to FED.R.CIV.P. 12(b)(6), the counterclaims filed by defendant Florida Prepaid Postsecondary Education Expense Board, for defamation, product disparagement and trade libel. For the reasons set forth herein, the Court will grant the motion, and will dismiss these counterclaims.

### I. BACKGROUND

The Complaint in this matter alleges that since September, 1987, plaintiff College Savings Bank ("CSB") has been in the business of selling the CollegeSure® CD, a deposit contract administered according to a patented method [1] and intended to provide a return adequate to satisfy college education expenses, even though those expenses are presently unknown. Defendant Florida Prepaid Postsecondary Education Expense Board ("Florida Prepaid") has administered a tuition prepayment program since September, 1988. Florida Prepaid is an agency of the State of Florida, pursuant to FLA.STAT.ANN. § 240.551. Complaint ¶ 8; Answer ¶ 6; Counterclaim ¶ 1.

Plaintiff alleges that Florida Prepaid extensively promotes its program through bro-

---

1. A related action, *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, Civ. No. 94–5610 (GEB), is also pending before this Court. That action concerns a dispute over CSB's patent on the CollegeSure® CD, U.S. Patent No. 4,722,055.

chures and other printed materials. Plaintiff also asserts that it and Florida Prepaid compete for sales of these college savings programs, and that its efforts to sell contracts have been hurt by "false and misleading claims that Florida Prepaid has made in its promotional materials." Complaint ¶ 11. CSB alleges that defendants falsely represented the Florida Prepaid program in the following respects: (1) that the State of Florida guarantees all contract beneficiaries to have the full amount necessary to fund a college education at a participating college or university, *id.* ¶ 14; (2) that any tax liability on a Florida Prepaid contract is deferred until the student reaps the benefits of the contract, *i.e.*, is enrolled at college, *id.* ¶ 22; (3) that Florida Prepaid's investments are backed by the "full faith and credit" of the United States, *id.* ¶¶ 30–32; and (4) that defendant failed to disclose, in its 1995 Annual Report, the existence of CSB's patent infringement action against it. *Id.* ¶¶ 37–39. The foregoing allegations form the basis of CSB's claim that defendant has violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and that it has committed the common law tort of unfair competition. *Id.* ¶ 42.

Florida Prepaid filed its Answer, Affirmative Defenses and Counterclaims on November 8, 1995. Its counterclaims accuse plaintiff of defamation, product disparagement and trade libel. These counterclaims are centered on a statement made by Peter Roberts, the President and Chief Financial Officer of CSB, as quoted by and printed in the September 13, 1995 edition of the *Miami Daily Business Review,* shortly after CSB filed the instant action. Commenting on the representations Florida Prepaid makes in the promotion of its deposit contract program, Mr. Roberts stated: "At best those claims are half-truths, and at worst they're outright lies." *See* Stan Yarbro, *Prepaid College Plan Faces New Suit from Rival,* MIAMI DAILY BUS.REV., September 13, 1995, at A1, A7, attached as Exh. C to Florida Prepaid's Answer, Affirmative Defenses and Counterclaims.

CSB now seeks to dismiss those counterclaims pursuant to FED.R.CIV.P. 12(b)(6). CSB first contends that Florida Prepaid, as a state agency, can not maintain an action for libel or defamation based on statements critical of government operations, as that speech is protected by the Free Speech Clause of the First Amendment to the United States Constitution.[2] CSB also insists that Roberts's statement is privileged speech because it comments on a judicial proceeding or a matter that is of public interest—*i.e.,* Florida Prepaid's prepayment program and the representations made in its promotion. CSB reasons that Roberts's statement essentially encapsulates the gist of their Lanham Act claims, which is that Florida Prepaid has made several misrepresentations about its program. Florida Prepaid responds that the action is not entitled to absolute protection by the First Amendment because it is false and malicious, and does not seek to share information regarding a matter of public concern.

## II. DISCUSSION

### A. STANDARD FOR A MOTION TO DISMISS

A motion to dismiss pursuant to FED. R.CIV.P. 12(b)(6) may be granted only if, accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief. *Bartholomew v. Fischl,* 782 F.2d 1148, 1152 (3d Cir.1986); *Angelastro v. Prudential–Bache Sec., Inc.,* 764 F.2d 939, 944 (3d Cir.), *cert. denied,* 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985). The Court may not dismiss a complaint unless plaintiff can prove no set of facts which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Angelastro,* 764 F.2d at 944. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S.

---

**2.** The First Amendment provides in relevant part that "Congress shall make no law ... abridging the freedom of speech[,]" U.S. CONST. amend. I, and has been made applicable to the states by the Fourteenth Amendment to the United States Constitution. *See Speiser v. Randall,* 357 U.S. 513, 535, 78 S.Ct. 1332, 1345, 2 L.Ed.2d 1460 (1958) (Douglas, J., concurring) (citing cases).

232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). In setting forth a valid claim, a party is required only to plead "a short plain statement of the claim showing that the pleader is entitled to relief." FED.R.CIV.P. 8(a).

### B. FLORIDA PREPAID'S COUNTERCLAIMS

■ The initial issue in this motion is whether Florida Prepaid, as a government agency, can maintain an action for libel or defamation. CSB claims that it cannot, in view the courts' treatment of libel actions brought by government entities. CSB first relies on the Illinois Supreme Court's decision in *City of Chicago v. Tribune Co.*, 307 Ill. 595, 139 N.E. 86 (1923), a matter in which the City of Chicago sued a newspaper for libel, accusing the newspaper of reporting that the city teetered on the verge of bankruptcy, that its credit was poor, and that it faced receivership. *Id.* The city alleged that the statements were false, and that the newspaper made them maliciously because it supported a rival candidate for the ongoing gubernatorial Republican primary. *Id.* The city also contended that the Free Speech Clause of the First and Fourteenth Amendments did not bar the suit, because the statement was libelous and the city could, as any other corporation, be libeled with respect to its "private" enterprises. The newspaper publisher admitted that the statements were largely false and malicious. *Id.*, 139 N.E. at 91. Nevertheless, the court concluded as follows:

> If this action can be maintained against a newspaper it can be maintained against every private citizen who ventures to criticize the ministers who are temporarily conducting the affairs of his government. Where any person by speech or writing seeks to persuade others to violate existing law.... he may be punished ... but all other utterances or publications against the government must be considered absolutely privileged.

*Id.*, 139 N.E. at 90.

The courts have consistently reaffirmed this view. A prominent example is language from the United States Supreme Court's decision in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Relying in part on *Tribune Co.*, the *Sullivan* Court observed that "[f]or good reason, 'no court of last resort in this country has ever held, or even suggested, that prosecution for libel on government have any place in the American system of jurisprudence.'" *Sullivan*, 376 U.S. at 291, 84 S.Ct. at 732 (quoting *Tribune Co.*, 139 N.E. at 88). The Court reiterated this view in *Rosenblatt v. Baer*, 383 U.S. 75, 81, 86 S.Ct. 669, 673, 15 L.Ed.2d 597 (1966), when it noted that the Constitution does not tolerate, in any form, prosecutions for libel on government. *See also City of Philadelphia v. Washington Post Co.*, 482 F.Supp. 897, 898 (E.D.Pa.1979) (In dismissing a city's action against a newspaper for allegedly false statements in an article about police brutality in Philadelphia, the court held that "[t]he City cannot maintain an action for libel in its own behalf. A governmental entity is incapable of being libeled."); *Johnson City v. Cowles Communications, Inc.*, 477 S.W.2d 750, 753 (Tenn. Sup.Ct.1972) ("[W]e hold that the article in question is absolutely privileged for the reason that any citizen, private or corporate, of these United States has an absolute privilege to make any statements, excepting only treasonable utterances, concerning a government, city or otherwise. Government has no capacity to apply either criminal or civil sanctions to the speaker or writer, without regard to the falsity of malice of the comment, for such sanctions are forbidden under the First and Fourteenth Amendments...."); *State of Louisiana v. Time Inc.*, 249 So.2d 328, 331 (La.Ct.App.) ("[W]e note that no American court which has dealt with the question of whether a government, be it state or local, has a cause of action for defamation, has reached a result contrary to that of *City of Chicago v. Tribune Co.*"), *writ. denied*, 252 So.2d 456 (1971); *Weymouth Township Board of Educ. v. Wolf*, 178 N.J.Super. 481, 483, 429 A.2d 431 (Law Div.1981) (dismissing township board of education's defamation action against taxpayers' association after finding that board of education, as a governmental agency, could not maintain action for defamation in its own right, because right to criticize government is absolutely privileged).

The reasoning behind these holdings is manifest. The Free Speech Clause of the First Amendment, applied to the states through the Fourteenth Amendment, *Speiser v. Randall*, 357 U.S. 513, 535, 78 S.Ct. 1332, 1345, 2 L.Ed.2d 1460 (1958) (Douglas, J., concurring) (citing cases), was intended to protect and to promote lawful and peaceful commentary on, and criticism of, the actions of government. This fundamental principle of our democratic structure simply does not tolerate retaliatory efforts by government, whether through threat of criminal or civil suit, to stifle open debate about its actions, regardless of the speaker's intent. A contrary holding would leave open the possibility that a government agency could file a civil action alleging defamation with malice, and thereby employ its potentially vast resources to chill speech in any number of contexts and regardless of the speaker's actual intent. *Sullivan*, 376 U.S. at 297, 84 S.Ct. at 735 (Black, J., concurring) ("This Nation, I suspect, can live in peace without libel suits based on public discussions of public affairs and public officials. But I doubt that a country can live in freedom where its people can be made to suffer … financially for criticizing their government, its actions, or its officials.").

█ That the government agency is performing in a proprietary capacity, as opposed to a traditional function, does not override its governmental capacity or change this rule. *See, e.g., Tribune Co.*, 139 N.E. at 91 ("[N]o distinction can be made with respect to the proprietary and Governmental capacities of a city."); *City of Albany v. Meyer*, 99 Cal.App. 651, 279 P. 213 (1929) (holding that municipal corporation can not maintain defamation action against publisher of false or malicious information, even as to municipality's proprietary function). To hold otherwise would subvert the aims of the Free Speech Clause, which must include a government's commercial endeavors as well as its more traditional functions, by failing to recognize that the government, even when functioning in a proprietary capacity, is nonetheless subject to the will of its citizens.

A good example is found in *Capital Regional Off–Track Betting Corp. v. Northeast-ern Harness Horsemen's Ass'n*, 92 Misc.2d 232, 399 N.Y.S.2d 597 (1977). There, the plaintiff, a public-benefit operating pari-mutuel betting in New York, brought a libel suit against a newsletter publisher, based on an article accusing plaintiff OTB of "flagrant violations of law, such as questionable auditing practices, continuous zoning violations and ignoring pari-mutuel revenue statutes." *Id.*, 399 N.Y.S.2d at 598. The court dismissed the action, holding that plaintiff's position as defendant's competitor did not override its status as a governmental entity. *Id.*, 399 N.Y.S.2d at 598–99 (citations omitted). *See also Progress Develop. Corp. v. Mitchell*, 219 F.Supp. 156 (N.D.Ill.1963) (holding that there is no distinction between traditional and proprietary functions of government actor for purposes of libel).

Florida Prepaid argues that Roberts's statement is not protected speech, because it does not relate to a matter of public concern. Florida Prepaid attempts to contrast Roberts's statement with the editorial advertisement at issue in *New York Times v. Sullivan* and the statement in *City of Chicago v. Tribune, Inc.*, to emphasize that Roberts's statement was comparatively less socially significant and therefore entitled to less protection under the First and Fourteenth Amendments. At a minimum, Florida Prepaid asserts, Roberts's statement is commercial speech that deserves less protection than political speech, and is therefore actionable upon a showing of malice.

█ This argument misses the mark for two reasons. First, the caselaw referenced above makes clear that the Court need not inquire any further once it determines that the entity seeking redress for allegedly libelous or defamatory statements is a governmental actor. In short, the traditional rule is that a government agency may not maintain a libel or defamation action regardless of the veracity of the statements or the existence of malice. *See, e.g., Rosenblatt*, 383 U.S. at 81, 86 S.Ct. at 673; *City of Phila.*, 482 F.Supp. at 898; *Johnson City*, 477 S.W.2d at 753; *Weymouth Township Board of Educ.*, 178 N.J.Super. at 483, 429 A.2d 431; *Capital Regional Off–Track Betting Corp.*, 399 N.Y.S.2d at 598–99. Indeed, in *Tribune Co.*,

there was no dispute before the Illinois Supreme Court that the statements were false and malicious. *Tribune Co.*, 139 N.E. at 91.

Second, Florida Prepaid's characterization of Roberts's statement as unimportant is dubious. By defendant's own admission:

> Florida Prepaid has been very successful in selling contracts for the Florida Prepaid College Program. To date, it has sold in excess of 327,000 contracts. The contracts are sold primarily to Florida residents because, with limited exceptions, only Florida residents are qualified beneficiaries....
>
> The Florida Prepaid College Program provides a great benefit to children who are residents of the State of Florida. The State of Florida considers the Florida Prepaid College Program to be an essential government operation to assist its citizens gain access to higher education.

Defendant's Counterclaims ¶¶ 8–9.

■ The accuracy of the representations Florida Prepaid makes in its promotional materials, regarding the program's guaranteed return and tax consequences, to prospective customers and purchasers of the approximately 327,000 existing contracts, is clearly an issue of public significance. Thus, while Florida Prepaid purports to function in a proprietary capacity in administering the program, it nonetheless performs "an essential government operation" that has affected hundreds of thousands of citizens, within and outside of Florida.[3] The public significance is therefore manifest. Roberts's statement, like the instant litigation, questions the ve-

racity of those representations, and therefore embodies an issue of public concern.[4] For these reasons, the Court concludes that Florida Prepaid may not, as a governmental agency, maintain its counterclaim for defamation.[5]

■ This conclusion does not end our inquiry. Florida Prepaid contends that its product disparagement and trade libel claims are inherently different from its defamation claim, thus removing them from the foregoing analysis. Florida Prepaid reasons:

> There are fundamental differences between defamation, trade libel and product disparagement claims. A defamation action encompasses libel and slander, and affords a remedy for damage to one's reputation. In comparison, an action for product disparagement is an offshoot of the cause of action for interference with contractual relations and affords a remedy for statements which attack the quality of the goods or services provided.

Defendant's Brief in Opposition to Motion to Dismiss at 17 (citing *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 924 (3d Cir.1990); *Dairy Stores, Inc. v. Sentinel Publishing Co., Inc.*, 104 N.J. 125, 516 A.2d 220 (1986)). Given these differences, Florida Prepaid suggests that the Free Speech Clause of the First Amendment does not protect Roberts's statement from the remaining claims, because these claims do not seek redress for defamatory statements, but for interference with prospective

---

**3.** That a statement embodies or addresses a commercial matter certainly does not preclude a court from finding that it falls within the realm of public concern. *See, e.g., Curtis Publishing Co. v. Butts*, 388 U.S. 130, 162–70, 87 S.Ct. 1975, 1995–2000, 18 L.Ed.2d 1094 (Warren, C.J., concurring). As such, it would be accorded greater constitutional protection than the intermediate-tier scrutiny usually applied to commercial speech. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 756–63, 105 S.Ct. 2939, 2943–48, 86 L.Ed.2d 593 (1985). *See also* Arlen W. Langvardt, *Section 43(A), Commercial Falsehood, and the First Amendment: A Proposed Framework*, 78 Minn.L.Rev. 309, 361–62, 395 (1993).

**4.** This is not to suggest that the statement is privileged or otherwise protected because it re-

lates to a judicial proceeding. "It is clear ... that statements given to the newspapers concerning the case are no part of a judicial proceeding, and are not absolutely privileged." W. Page Keeton et al., Prosser and Keeton on Torts § 114, at 820 (5th ed. 1984).

**5.** This analysis assumes that the State of Florida or Florida Prepaid, as a government agency, even has a "personal reputation" capable of being defamed, an issue that the Court need not reach here. *Cf. Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1139, 1142 (7th Cir.1987), *cert. denied*, 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1985); *Bose Corp. v. Consumers Union of United States*, 508 F.Supp. 1249 (1981), *rev'd*, 692 F.2d 189 (1st Cir.1982), *aff'd*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

or existing business relations by targeting the services it provides.

Trade libel and product defamation lie within the general rubric of the tort of injurious falsehood, itself born of the cause of action for unlawful interference. W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS § 128, at 962 (5th ed. 1984) (hereinafter "PROSSER AND KEETON"); *Dairy Stores, Inc.*, 104 N.J. at 134, 516 A.2d 220; *C.R. Bard, Inc. v. Wordtronics Corp.*, 235 N.J.Super. 168, 172, 561 A.2d 694 (Law Div.1989). Injurious falsehood exists if a party publishes material derogatory to another's business, intending to prevent others from dealing with plaintiff. RESTATEMENT (SECOND) OF TORTS § 623A (1977); PROSSER AND KEETON § 128, at 963. *See also Binkewitz v. Allstate Insur. Co.*, 222 N.J.Super. 501, 516 n. 8, 537 A.2d 723, *certif. denied*, 113 N.J. 378, 550 A.2d 481 (1988). Product disparagement

> consists of the publication of matter derogatory to the plaintiff's title to his property, or its quality, or to his business in general, or even to some element of his personal affairs, of a kind calculated to prevent others from dealing with him or otherwise to interfere with others to his disadvantage.

*Bard*, 235 N.J.Super. at 172, 561 A.2d 694 (citation omitted). In most contexts, "trade libel" is essentially another name for the same cause of action. Dean Prosser has explained as follows:

> There is a tort which passes by many names. Sometimes it is called slander of title, sometimes slander of goods, or disparagement of goods, or trade libel, or unfair competition, or interference with prospective advantage, or whatever else the fancy of the particular Judge or writer may lead to select. Under whatever name, the essentials of the tort appear to be the same. It consists of the publication, or communication to a third person, of false statements concerning the plaintiff, his property, or his business.

Dean Prosser, *Injurious Falsehood: The Basis of Liability*, 83 N.J.L.J. 1 (1960) (quoted in *Henry V. Vaccaro Construction Co. v. A.J. DePace, Inc.*, 137 N.J.Super. 512, 514, 349 A.2d 570 (Law Div.1975)).

By no means, however, are these torts entirely distinct from defamation. The foregoing discussion suggests that either claim requires scrutiny of the statement or publication, the circumstances under which it was made, and whether the statement or publication was false. *See* PROSSER AND KEETON § 128, at 962–65. *See also* Arlen W. Langvardt, *Section 43(A), Commercial Falsehood, and the First Amendment: A Proposed Framework*, 78 MINN.L.REV. 309, 334–337 (1993) (hereinafter "Langvardt, *A Proposed Framework*"). Indeed, while defamation stems from a different branch of tort law than do product disparagement and trade libel, the circumstances under which the statements giving rise to these claims are made may control how the court treats them. *See Dairy Stores, Inc.*, 104 N.J. at 134, 516 A.2d 220 ("The two causes may merge when a disparaging statement about a product reflects on the reputation of the business that made, distributed, or sold it. If, for example, a statement about the poor quality of a product implies that the seller is fraudulent, then the statement may be actionable under both theories.") (citing PROSSER AND KEETON § 111, at 771; RESTATEMENT (SECOND) OF TORTS § 559).

The distinctions lie in the interest that is allegedly harmed by the statement, the standard of proof and which party must bear that burden. Thus, where a statement casts aspersions on the reputation of an individual's reputation, rather than his product or service, the claim will be treated as a cause of action for defamation, and the plaintiff will be entitled to a presumption that the statement was false and harmful. *See* 2 F. HARPER, F. JAMES & O. GRAY, LAW OF TORTS § 6.1, at 474 (2d ed. 1986); Langvardt, *A Proposed Framework*, at 341; *Dairy Stores, Inc.*, 104 N.J. at 134, 516 A.2d 220. If the statement impugns a product or service, it will be treated as an injurious falsehood, which likely will require plaintiff to prove defendant's fault and, depending on the jurisdiction, that defendant made the statement with knowledge of its falsity, a reckless disregard for the truth, ill will, malice, or intending to inflict economic harm. RESTATEMENT (SECOND) OF TORTS §§ 623A, 633, 651 (1977); Langvardt,

*A Proposed Framework*, at 337 & nn. 118–21. Additionally, a plaintiff in an injurious falsehood action, to obtain any relief, must establish special economic damages stemming from the statement, because unlike defamation actions, damages are not presumed. PROSSER AND KEETON § 128, at 967, 970–71. However, the distinction as to which party shoulders the burden of proof is extinguished if the defamatory statement addresses a matter of public concern, thus requiring plaintiff to bear the burden of proof as to falsity and malice. *See Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 768–69, 106 S.Ct. 1558, 1559–60, 89 L.Ed.2d 783 (1986) ("[W]e hold that, at least where a newspaper publishes speech of public concern, a private-figure plaintiff cannot recover damages without also showing that the statements at issue are false.").

Accordingly, in resolving the instant issue, the differences between product disparagement and trade libel defamation, in terms of their varying roots in tort law and elements of proof, are irrelevant, particularly since the Court has determined that Roberts's statement addresses a matter of public concern. If the First Amendment protects anything, it must protect statements that are critical of services or actions undertaken by a government and affecting the public interest. In short, it would be anomalous to hold that the Free Speech Clause protects statements about a government or government agency against a defamation claim, but not against a trade libel or product disparagement claim concerning the services that a government or one of its agencies provides.[6] Clearly, the alleged injurious falsehood at issue here merits no less constitutional protection than as against Florida Prepaid's defamation claim.[7]

Measured against these constitutional interests, it matters little that product disparagement and trade libel require plaintiff to prove a particular level of intent and special economic damages, while defamation does not. Accordingly, the Court concludes that the First and Fourteenth Amendments also protect Roberts's statements as against Florida Prepaid's claims for product disparagement and trade libel.

■ The Court's holding does not change in view of the 1988 amendment to § 43(a) of the Lanham Act. Although Florida Prepaid did not brief this issue, nor assert counterclaims under § 43(a) of the Lanham Act, nor seek leave of the Court to do so, it asserted at oral argument that the 1988 amendment allows for its product disparagement and trade libel claims. The Court must assume that Florida Prepaid somehow construes the 1988 amendment as affecting its right to bring injurious falsehood claims as purely common law claims, because there is no Lanham Act claim, nor a motion to amend the counterclaims to include one, before it. In either event, it is clear that such a claim can not survive College Savings Bank's challenge under the First Amendment.

On November 16, 1989, the Trademark Law Revision Act of 1988 ("TLRA"), 15 U.S.C. §§ 1051–1128 (1988), took effect. The TLRA contained a revised version of § 43(a), which states as follows:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading misrepresentation of fact, which—

---

**6.** This is so particularly given that one's interest in his personal reputation has been considered more significant, and thus accorded more protection, than an interest in the reputation of a product or service. *Bose Corp. v. Consumers Union of United States, Inc.,* 508 F.Supp. 1249, 1270 (D.Mass.1981), *rev'd on other grounds,* 692 F.2d 189 (1st Cir.1982), *aff'd,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). *See also Dairy Stores, Inc.,* 104 N.J. at 134, 516 A.2d 220 ("[C]ourts have responded more readily to a claim of damage to one's reputation than to a claim for product disparagement.").

**7.** *See* RESTATEMENT (SECOND) OF TORTS § 623A (1977) & cmts. c, d. Several courts have interpreted *Bose* as calling for application of defamation's constitutional analysis to claims of injurious falsehood. *See, e.g., Flotech v. E.I. DuPont de Nemours Co.,* 814 F.2d 775, 777 (1st Cir.1987) (applying public/private figure approach in defamation action to injurious falsehood); *Blatty v. New York Times Co.,* 42 Cal.3d 1033, 232 Cal.Rptr. 542, 545, 547–49, 728 P.2d 1177, 1181, 1182–83 (1986) (same), *cert. denied,* 485 U.S. 934, 108 S.Ct. 1107, 99 L.Ed.2d 268 (1988).

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (1988).[8]

The effect of the 1988 amendment to subsection (2) of § 43(a) is most relevant here. That amendment now authorizes suit under the Lanham Act when an individual misrepresents the plaintiff's goods, services or business activities. Thus, Congress amended the Act to overrule caselaw holding that a plaintiff stated a viable § 43(a) claim only when the alleged falsehood spoke to the defendant's product or service. *See* S.Rep.

No. 515, 100th Cong., 2d Sess. 40 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5577, 5603; Langvardt, *A Proposed Framework*, at 326. By allowing the amended § 43(a)(2) to function as a vehicle for "commercial defamation," such that a defendant's falsehoods about plaintiff's product or service are now actionable as well as defendant's falsehoods about its own product or service, a plaintiff might seek redress under the Lanham Act, whereas formerly plaintiff's only recourse would have been the common law claims of defamation and/or product disparagement and trade libel. If the unfair competition claim is based on statements about another's product or service, § 43(a)(2) requires plaintiff to establish the following: (1) that defendant made misleading or false factual representations of the quality or nature of plaintiff's goods or services; (2) that the misleading or false representation was used "in commerce," or in regard to any service; (3) that defendant made the false or misleading statement in a "commercial advertising or publication" to promote the good or service or otherwise further his own business interests;[9] and (4) that plaintiff rea-

---

**8.** Prior to November 16, 1989, § 43(a) read in pertinent part as follows:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation. 15 U.S.C. § 1125(a) (1982).

**9.** Significantly, the 1988 amendment requires that defendant issue the statement or publication in a "commercial advertising or promotion" context. 15 U.S.C. § 1125(a)(2) (1988). Therefore, a statement is actionable under the "commercial advertising" prong only if made in an advertisement, whether that be printed or broadcasted, and seeks to sell goods or services or otherwise advance the speaker's related business interests. *See, e.g., Wojnarowicz v. American Family Ass'n,* 745 F.Supp. 130, 141–42 (S.D.N.Y.1990) (observing that § 43(a) "has never been applied to stifle criticism of the goods or services of another by one ... who is not engaged in marketing or promoting a competitive product or service....

'The section is narrowly drafted to encompass only clearly false and misleading commercial speech.' ") (quoting CONG.REC. H10421 (daily ed. Oct. 19, 1988) (remarks of Rep. Kastenmeier)). The use of "promotion" is less clear. It is subject to the same restrictions reflected in Representative Kastenmeier's remarks, but would seem to contemplate statements made outside the conventional business setting and not fitting so neatly within the common understanding of "promotion." Given the amendment's purpose of creating a cause of action where a competitor maligns plaintiff's product or service to bolster his own sales, *see supra,* "promotion" might be sufficiently broad to include statements not part of any formal promotional or advertising campaign. *See, e.g., Weaving,* 769 F.Supp. at 1232–36 (holding that defendants' alleged misrepresentations about services of plaintiff booking agency, made in calls to potential customers for defendant's own agency that were also partly social in nature, were within scope of § 43(a)(2)). One commentator has speculated that injurious statements about another's product or service made in other settings, such as press conferences or interviews, might fall within the scope of "promotion" if those statements are viewed as prompted by defendant's commercial concerns. *See* Langvardt, *A Proposed Framework,* at 328 n. 78.

In this case, the Court need not reach this issue, for the reasons set forth *infra.* It bears

sonably believed he was likely to suffer damages from the false or misleading representations. 15 U.S.C. § 1125(a)(2) (1988). *See also Nat'l Artists Management Co., Inc. v. Weaving*, 769 F.Supp. 1224, 1230 (S.D.N.Y.1991).

With the history of § 43 and the objectives of its 1988 amendment in mind, the Court will now turn to the issue at hand. Florida Prepaid avers that its ability to raise common law injurious falsehood claims is enhanced by the 1988 amendment. Florida Prepaid asserts that the 1988 amendment provided the basis for CSB's Lanham Act claims, and that it would be unfair to deny it the same legal right. This reasoning is incorrect. CSB's claims against Florida Prepaid are based on Florida Prepaid's alleged misrepresentations of its own program, and could have been asserted under the pre-November 16, 1989 version of § 43. *See* Complaint ¶¶ 11, 14, 22, 30–32, 37–39, 42.

The Third Circuit so ruled in *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649, 650–51 (3d Cir.1954). There, a dress manufacturer brought suit alleging that defendant's advertisement misrepresented the quality of a dress defendant sold. Reversing the district court's dismissal of the claim, the Third Circuit held that a commercial party may use § 43 to seek relief for another's false advertising of its own product. *Id. See also* Joseph P. Bauer, *A Federal Law of Unfair Competition: What Should Be the Reach of Section 43(a) of the Lanham Act?*, 31 U.C.L.A.L.Rev. 671, 685–86 & nn. 61–64 (hereinafter "Bauer, *A Federal Law of Unfair Competition*") (citing cases). Since then, the federal courts have witnessed numerous § 43(a) lawsuits predicated on an individual's alleged misrepresentations about its own product or service. *See, e.g., McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.*, 938 F.2d 1544 (2d Cir.1991); *McNeilab,*

*Inc. v. American Home Products Corp.*, 848 F.2d 34 (2d Cir.1988); *Coca–Cola Co. v. Tropicana Products.*, 690 F.2d 312 (2d Cir.1982). *See also* Langvardt, *A Proposed Framework*, at 317–18 & nn. 29–36 (citing cases and observing that "[c]ommercial plaintiffs' resort to section 43(a) as a private remedy for false advertising has emerged as a commonplace use of the statute."). Accordingly, the Court rejects Florida Prepaid's contention that it is the amendment to the 1988 Lanham Act that allows for College Savings Bank's § 43(a) claims.

More importantly, the Court does not accept Florida Prepaid's reasoning that the 1988 amendment alters the First Amendment analysis attendant to common law defamation and injurious falsehood claims so drastically as to allow a government agency to bring now either those state law causes of action or a § 43(a) cause of action based on Roberts's statement. Such a view would apply an impermissibly low level of constitutional protection to Roberts's statement. The legislative history of the 1988 amendment instructs us otherwise:

> To avoid legitimate constitutional challenge, it was necessary to carefully limit the reach of the subsection. Because section 43(a) [now provides] a kind of commercial defamation action, the reach of the section specifically extends only to false and misleading speech that is encompassed within the 'commercial speech' doctrine by the United States Supreme Court.

134 Cong.Rec. H10420 (daily ed. Oct. 19, 1988) (remarks of Rep. Kastenmeier). Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New*

---

noting, however, that Roberts's statement could well be likened to a "promotion." Considering that College Savings Bank initiated the instant lawsuit under the Lanham Act, and the fierce competition between the parties for sales of their savings programs, Roberts's statement was clearly motivated at least partly by CSB's business interests. At a minimum, it was tied directly to a competitor's product and its characteristics. *See* 134 Cong.Rec. S16973

(daily ed. Oct. 20, 1988) (remarks of Sen. De-Concini) ("It is also Congress['s] intent that the 'commercial' language be applicable any time there is a misrepresentation relating to goods or services."). However, this observation can not override the public significance of his statement, which removes it from consideration under § 43(a). *See infra* pages 765–766 and note 10.

*York,* 447 U.S. 557, 561, 100 S.Ct. 2343, 2348, 65 L.Ed.2d 341 (1980).[10]

Regardless of Roberts's intent in making the statement, or that he made it in the context of competition between College Savings Bank and Florida Prepaid, both in the courtroom and in the business world, his statement can not be considered merely commercial speech. As noted above, *see supra* pages 8–9, his statements speak directly to an action of the State of Florida that affects hundreds of thousands of investors, the majority of which are citizens of Florida. *See id.* at 8 (quoting Defendant's Counterclaims ¶¶ 8–9). In its promotional materials, Florida Prepaid itself characterizes its program as "an essential government operation." *Id.* Thus, Roberts's statement to the *Miami Daily Business Review* assumes public significance and consequently a level of protection significantly higher than the intermediate level of scrutiny afforded to commercial speech. As such, it is clearly protected by the First Amendment and, in any event, falls outside the "commercial" requirement of § 43(a). It would be wholly incongruous with the objectives of § 43(a), which does not override the First Amendment to allow for a commercial defamation action by a government or a government agency, to find that the 1988 amendment transmogrifies the common law torts of injurious falsehood and defamation by now allowing the government to assert those causes of action. If anything,

the 1988 amendment's focus on commercial defamation continues to limit application of § 43(a) to commercial contexts, *see supra,* leaving defamation and injurious falsehood claims as potential remedies for all other libel injuries. Thus, where the statement is critical of government, public officials, or the services government provides, and thereby contains a political speech component or otherwise assumes public significance, the same constitutional interests that preclude government from bringing a defamation or injurious falsehood action apply with equal force to § 43(a). *See Nat'l Artists Management Co., Inc.,* 769 F.Supp. at 1232. Accordingly, the Court concludes that Florida Prepaid's claims, whether cast as common law torts in the wake of the 1988 amendment to the Lanham Act, or as § 43(a) claims, must be dismissed.

### III. CONCLUSION

For the reasons set forth above, the Court will grant plaintiff CSB's motion, and will dismiss the counterclaims for product disparagement, trade libel and defamation. An appropriate form of Order is filed herewith.

### ORDER

For the reasons set forth in the Memorandum Opinion filed on this same date;

IT IS on this 22nd day of March, 1996,

---

**10.** The Senate might have taken a broader view of the reach of § 43(a), as reflected in Senator DeConcini's statements:

> [T]he word "commercial" is intended only to eliminate any possibility that the section might be applied to political speech. Although the Senate sees this language as unnecessary because section 43(a) requires that the misrepresentations be made with respect to goods or services, we consider inclusion of the language so long as Congress['s] intent that it be interpreted only as excluding political speech is clear. It is also Congress['s] intent that the "commercial" language be applicable any time there is a misrepresentation relating to goods or services.

134 Cong.Rec. S16973 (daily ed. Oct. 20, 1988) (remarks of Sen. DeConcini). At least one court has noted that such a broad interpretation of the statute raises potential constitutional concerns. In *Nat'l Artists Management Co., Inc. v. Weaving,* 769 F.Supp. 1224 (S.D.N.Y.1991), the court stated in relevant part:

> The Senate's interpretation . . . raises constitutional concerns because it fails to consider speech that relates to both goods and services, as well as political issues—for example, misrepresentations made by interested groups which may arguably disparage a company's failure to divest its South African holdings, or disparaging statements regarding a corporation's policy toward product design, included in a law review article addressing the law of product liability. If "the 'commercial language' is applicable any time there is a misrepresentation relating to goods or services," the amended section 43(a) would be applicable to such political speech. To avoid these concerns, and to give the word "commercial" meaning, we read "commercial" to describe advertising or promotion for business purposes.

*Id.* at 1232.

ORDERED that plaintiff College Savings Bank's motion to dismiss the counterclaims pursuant to FED.R.CIV.P. 12(b)(6) is hereby GRANTED; and it is further

ORDERED that Counterclaims I, II and III are hereby DISMISSED.